FREDERICK M. KER

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Ottawa May 19, 1884.*

1.   CRIMINAL LAW—*plea to jurisdiction—illegal arrest in foreign country.*   To an indictment for embezzlement and larceny the defendant pleaded to the jurisdiction of the court, in substance, that the President of the United States, upon the written request of the Governor of this State, issued an extradition warrant to the government of Peru for the surrender of the defendant, under the treaty with that government, to be brought back to this country on a charge of larceny; that on the same day this warrant was issued, the Secretary of State made a written request upon the United States consul acting at Lima, to procure the executive of Peru to surrender the defendant to one Julian, under said treaty; that no request was ever made by said consul, or by Julian, or by any other person, upon any of the authorities of the government of Peru for the surrender of defendant, nor was any consent or authority given by any of the authorities or agents of Peru, to Julian or to any other person,

to arrest and remove defendant from Peru; and that on April 3, 1883, while the defendant was domiciled at Lima, in Peru, Julian, with the aid of persons whose names were unknown, without any authority or warrant from the authorities or diplomatic agents of Peru, arrested the defendant, and forced him to go to Callao, and there placed him on board a vessel and carried him to Honolulu, and at that port transferred him to another vessel which carried him to San Francisco, California, where he was arrested on a requisition from the Governor of this State, and brought to this State for trial. The court below sustained a demurrer to this plea: *Held*, that the demurrer was properly sustained.

2. SAME—*on requisition, regularity of arrest not open to question.* Where a person charged with crime in this State was arrested in a sister State and brought here for trial, on a requisition of the Governor of this State, it was *held*, that our courts, on the trial of such fugitive, would not inquire into the regularity of his arrest and surrender in such sister State, and that it did not matter if he had been illegally arrested in a foreign country and brought forcibly to such sister State.

3. SAME—*fugitive from justice—legality of arrest not a question for the courts.* Where legal steps have been taken for the apprehension and return to this country of a fugitive from justice, and he is brought back to the United States, where he is arrested on a requisition of the Executive of this State and brought here for trial, the fact that he may have been illegally arrested in such foreign country and brought to the United States, does not deprive the courts of this State of jurisdiction to try him for any offence charged against him, the State not being a party to such illegal arrest and abduction.

4. SAME—*legality of arrest of a fugitive from justice in a foreign country not necessary to give court jurisdiction.* The rule at common law is, that the court trying a party for crime committed within its jurisdiction, will not investigate the manner of his capture in a foreign State or country, though his capture and return may have been plainly without authority of law.

5. SAME—*right of asylum to fugitive from justice.* A fugitive from justice has no asylum in a foreign country when he is guilty of an offence for which he is liable or subject to extradition, by treaty between this and the foreign government. If he is illegally and forcibly removed from such foreign country, that country alone has cause of complaint, and he can not complain for it.

6. SAME—*extradition of fugitives depends on treaty.* Where no treaty exists between two governments for the extradition of criminals fleeing from justice, there is no obligation existing that can be insisted upon to surrender them for trial to the government from which they have fled; but as a matter of comity between friendly nations, great offenders are usually surrendered on request of the government claiming the right to punish them.

7. SAME—*fugitive, when extradited, must be tried only for the crimes named in treaty.* Where a fugitive from justice has been brought back to the country from which he has fled, on a warrant of extradition in conformity with the terms of a treaty existing between two governments, he can not be proceeded against or tried for any other offences than those mentioned in the treaty, and for which he was extradited, without first being afforded an opportunity of returning. But this doctrine has no application where the fugitive has been brought back forcibly, and not under the terms of the treaty, or under an extradition warrant.

8. SAME—*variance as to ownership of securities embezzled.* An indictment for embezzlement and larceny charged the money, funds and securities embezzled and stolen, as the goods and personal property of A, B and C, partners under the name of A, B & Co. The proof showed that before the alleged offence the firm was composed of A, B, C and D, doing business under the same name, the latter being a special partner, and that the articles of partnership were a matter of record; but that before the alleged offence, D retired from the firm, although the dissolution of the firm of the four was not made a matter of record, and notice given, as required by law: *Held,* that there was no variance, as, after D retired, the property in fact belonged only to A, B and C.

9. SAME—*embezzlement—compelling an election as to a single act.* On an indictment for embezzlement and larceny of moneys, funds and securities, there is no error in the court refusing to compel the prosecution to elect upon what alleged act of embezzlement or larceny a conviction will be asked, as embezzlement may, and most often does, consist of many acts done in a series of years by virtue of the confidential relations existing between the employer and employe.

10. SAME—*indictment for embezzlement—evidence of various acts.* The statute (section 82 of the Criminal Code) makes it sufficient for an indictment for embezzlement to allege, generally, an embezzlement, fraudulent conversion, or taking with intent to convert to the defendant's own use, the money, funds or securities of the employer to a certain amount or value, without specifying any particulars of such embezzlement, and on the trial, evidence may be given of any such embezzlement, fraudulent conversion, or taking with such intent; and it is made sufficient to maintain the indictment, that any bullion, money, note, bank note, check, draft, bill of exchange or other security for money of the employer, of whatever value or amount, was fraudulently converted or taken with such intent by the clerk or employe. In such case it is proper to allow proof of any and all acts of embezzlement to go to the jury.

11. SAME—*new trial—question of fact and of law.* Ordinarily, whether there is evidence to warrant a conviction in a criminal case is a question for the jury, the court taking care always to see that no manifest injustice has been done; but whether the verdict is contrary to the law, is a question for the court.

12. Same—*when verdict is against the law.* A verdict in a criminal case is against the law when, admitting all the evidence tends to prove, it does not show the crime charged.

13. Same—*indictment good, in language of the statute.* An indictment for embezzlement substantially in the language of the statute is sufficient.

14. Same—*statute defining embezzlement, construed.* The word "care," as used in section 75 of the Criminal Code, relating to embezzlement, is the equivalent of "custody," and may mean "charge," "safe keeping," "preservation," or "security." The word "possession," as used in the same section, has, perhaps, a different and broader meaning than the word "care;" but it may also mean, "to keep," "to take or seize hold," "to hold or occupy," as the owner of property would or might do. And it matters little whether one or both words are used in an indictment.

15. Same—*what is possession of goods by an employe, belonging to employer.* A bank clerk having access to the funds and securities of the bank in its vaults, and trusted with their keeping for various purposes, may be said to have their possession by virtue of his employment, within the meaning of section 75 of the Criminal Code.

16. Same—*embezzlement—larceny at common law.* The fact that the felonious taking of moneys and securities out of a bank vault by a bank clerk, and converting them to his own use, may be larceny at common law, makes it no less embezzlement under the statute. It is entirely competent for the legislature to declare what acts shall constitute the crime of embezzlement, and fix the punishment.

Writ of Error to the Criminal Court of Cook county; the Hon. Joseph E. Gary, Judge, presiding.

Mr. Robert Hervey, and Mr. C. Stuart Beattie, for the appellant:

Leaving the question of the treaty out of consideration, the prisoner could not set up the manner in which he was brought within the jurisdiction of the court, as a reason why he should not be held in custody to answer to the indictment. *Ex parte Scott,* 9 Barn. & Cress. 446; *The State* v. *Brewster,* 7 Vt. 118; *The State* v. *Smith,* 1 Bailey, (S. C.) 283; *Dow's case,* 18 Pa. St. 37; *The State* v. *Ross & Mann,* 21 Iowa, 467; *The People* v. *Rowe,* 4 Park. Cr. 253; *Lagrave's case,* 14 Abb. (N. S.) 343; 9 Wharton on Crim. Pl. & Prac. 27.

Treaties of the United States are the law of the land, and bind the judges in every State.   U. S. Const. art. 6, sec. 2.

A person extradited can be tried only for the extradited offence.   *Adriance* v. *Lagrave,* ·59 N. Y. 110 ;   *United States* v. *Caldwell,* 8 Blatchf. C. C. 131 ;   *Blandford* v. *The State,* 10 Texas Ct. of App. 635.

We contend that the prisoner could not be taken from Peru in any other mode than under the treaty, and consequently the court acquired no jurisdiction, and that the act of Congress of 1867 protected the prisoner from being captured in violation of a treaty.   Cooley's Const. Lim. p. 16, notes, and p. 21, note 1 ;   *The People* v. *Curtis,* 50 N. Y. 321 ;   *The People* v. *Brady,* 56 id. 182 ;   *In re White,* 49 Cal. 434 ;   *In re Cannon,* 47 Mich. 981 ;   *Commonwealth* v. *Hawes,* 13 Bush, 697 ; *Jones* v. *Leonard,* 50 Iowa, 106.

Also, that there was a variance between the allegation and proof as to the ownership of the property.   *Hogg* v. *The State,* 3 Blackf. 326 ;   2 Greenleaf on Evidence, sec. 22 ;   Rev. Stat. chap. 84, sec. 12.

The court should have required the prosecution to elect for what act out of the many they would seek a conviction. *Kribs* v. *The People,* 82 Ill. 425.

Only one crime can be charged in an indictment, except for a few statutory misdemeanors, although the pleader may allege the offence in as many ways as he desires, provided he pleads them all as felonies or all as misdemeanors.   *Lyons* v. *The People,* 68 Ill. 275 ;   *Beasley* v. *The People,* 89 id. 578.

Although section 82 of the Criminal Code has declared that a certain class of embezzlements may be pleaded generally, that has not changed the rule of evidence.   *Goodhue* v. *The People,* 94 Ill. 37.

It is necessary to support the verdict that the evidence should show that the stolen property had been delivered to Ker as a bailment, under section 74, or that he had gotten it before the conversion, by virtue of ·his employment, under

the 75th section. The proof shows clearly that Ker only had access to the money and bonds of the bank,—not even charge, say nothing of possession.

The verdict can not be sustained for two reasons: First, the offences are not in the words of the statute; and second, because being larceny under section 167, and at common law, they are not within the intent of the statute. There can be no crime, under sections 74 and 75, when the original taking is felonious, because the statute applies only to cases where the original taking was lawful, but a subsequent conversion is made. 2 Wharton on Crim. Law, (7th ed.) 1905.

Taking property from the actual or constructive possession of the master by a servant, is larceny. 2 Wharton on Crim. Law, (7th ed.) 1924; 2 Archbold's Crim. Plead. 560, *et seq.*; *The People* v. *Sherman*, 10 Wend. 298; *The People* v. *Dalton*, 15 id. 581; *Lœwenthal* v. *The State*, 32 Ala. 589.

The statutes in relation to embezzlement were passed solely and exclusively to provide for cases which larceny at common law did not include,—hence, nothing that was larceny at common law is larceny under the embezzlement statutes. *Kribs* v. *The People*, 81 Ill. 599; 2 Wharton on Crim. Law, 1905.

Mr. LUTHER LAFLIN MILLS, and Messrs. SWETT, HASKELL & GROSSCUP, for the People:

It will not avail one charged with crime, that the means and force by which he was brought within the jurisdiction of the court were illegal. *Rex* v. *Marks*, 3 East, 157; *Ex parte Kraus*, 1 Barn. & Cress. 258; *Ex parte Scott*, 9 id. 446; *The State* v. *Smith*, 12 S. C. 430; *The State* v. *Brewster*, 7 Vt. 118; *Dow's case*, 18 Pa. St. 37; *The People* v. *Rowe*, 4 Park. Cr. 253; *Ex parte Coupland*, 26 Texas, 328; *The State* v. *Ross*, 21 Iowa, 467; *United States* v. *Caldwell*, 8 Blatchf. 131; *Adriance* v. *Lagrave*, 59 N. Y. 110; *United States* v. *Lawrence*, 13 Blatchf. 306.

The court will not look into the question how the accused was captured. *Ex parte Scott,* 9 Barn. & Cress. 446; *The State* v. *Smith,* 12 S. C. L. 283; *The State* v. *Brewster,* 7 Vt. 118; *The People* v. *Rowe,* 4 Park. Cr. 253. See, also, cases above cited.

The statutes of this State defining embezzlement do not follow the common law definitions. Under our statutes the same acts may be both embezzlement and larceny, and the fact that the acts proved constitute larceny at common law, does not prevent the act from being embezzlement. The statutes of this State create the crime of embezzlement independently of the common law, and any act that comes within the meaning of the statute is embezzlement, irrespective of the common law definition. Cases based upon statutes differently framed can have no bearing.

While the *legal possession* of the moneys, etc., was in the firm of Preston, Kean & Co., the *actual possession* was in all who had access to the vaults, and who at all times could put their hands upon the money and securities.

There was no error in refusing to require the prosecution to elect upon which act of embezzlement they should proceed, for the reason that the evidence submitted did not show that there were separate acts of embezzlement. It was a question of fact if the whole amount had been embezzled at one time or at different times, and the court properly submitted that question to the jury. *The People* v. *McKinney,* 10 Mich. 95; Bishop on Crim. Proc. 460, note; *Rex* v. *Dunn,* Car. Cr. L. (3d ed.) 82.

Mr. JUSTICE SCOTT delivered the opinion of the Court:

It appears from the record before this court, that at the February term, 1883, of the Criminal Court of Cook county, the grand jury presented, in open court, an indictment against Frederick M. Ker, which contained four counts, in the first of which he is charged with embezzlement as bailee;

in the second, with embezzlement as a clerk; in the third, with larceny as at common law; and in the fourth, with receiving stolen property. In the several counts, the money, funds and securities alleged to have been embezzled and stolen are alleged to be the personal goods and property of David Preston, Samuel A. Kean and Elisha Gray, a co-partnership firm under the name of Preston, Kean & Co. On the 13th day of October, 1883, defendant, on being arraigned, filed a plea to the jurisdiction of the court over his person, the effect of which was to ask immunity from prosecution on the indictment then pending against him, for the reasons set forth in his plea. To that plea a general demurrer was sustained, and defendant was, by the court, required to plead over. Against the protest of defendant that he was entitled to immunity from prosecution for the offences alleged against him in the indictment, on account of the matters set forth in his plea, and because he refused to plead over, the court entered a plea of not guilty for him. On the trial the jury found defendant guilty of embezzlement, as charged in the indictment, and fixed the term of punishment at ten years in the penitentiary. A motion for a new trial entered by defendant was overruled, and the court pronounced judgment on the verdict, and defendant brings the case to this court on error.

One ground of error relied on with much confidence is the decision of the court sustaining the demurrer to defendant's plea calling in question the right or jurisdiction of the court to proceed with the trial against him,—or, what is the same thing, it is insisted it was error in the court not to grant him immunity from prosecution. Of course, the demurrer admits the facts alleged in the plea, and there can be no controversy as to what they are. Shortly stated, the principal facts are, that upon the written request of the Governor of Illinois, the President of the United States issued an extradition warrant, directed to the government of the republic of Peru, for the

surrender of defendant, under the treaty of our government
with that government, and named therein Henry G. Julian
as messenger to receive defendant from the authorities of
Peru. The crime of larceny, with which defendant stood
charged, is one of the offences specified in the treaty for
which a party should be surrendered, and it was specified in
the President's warrant as the crime for which his surrender
was demanded. On the same day the executive warrant was
issued, the Secretary of State at Washington made a written
request upon the United States Consul acting at Lima, to
procure the executive of Peru to surrender defendant to
Julian, under the treaty between the United States and Peru
of September 12, 1870, which, it is averred, was and is the
only treaty in force between the two governments. It is then
averred no request was ever made by the United States Con-
sul at Lima, or by Julian, or any other person, upon any of
the authorities or diplomatic agents of the government of
Peru, for the surrender of defendant, in compliance with the
President's warrant, nor was any consent or authority given
by the authorities or diplomatic agents of Peru, to Julian or
to any other person, to arrest and remove defendant from
Peru, for any cause, and that on the 3d day of April, 1883,
while defendant was domiciled at Lima, in Peru, Julian, with
the aid of persons whose names are unknown, without any
authority or warrant from the authorities or diplomatic agents
of Peru, arrested defendant, and forced him to go to Callao,
and there placed him on board the steamship "Essex," and
kept him a close prisoner on such vessel. Afterwards the
"Essex" sailed to the port of Honolulu, with defendant on
board, and there, at that port, but perhaps outside the har-
bor, defendant was transferred to the "City of Sidney," an
American ship about to sail for San Francisco, in California.
The steamship "Essex" was a vessel belonging to the navy
of the United States, and was at the time commanded by
officers of the navy. The "City of Sidney" was perhaps an

American merchant vessel,—but how that is, matters little.
While these events were transpiring, the parties prosecuting
procured from the Governor of the State of Illinois a requisi-
tion upon the Governor of California, for the arrest of defend-
ant, in which Frank Warner was named a suitable person
to receive defendant from the authorities of California and
bring him to this State for trial.   Afterwards the Governor
of California issued his warrant, in pursuance with the requi-
sition of the Governor of the State of Illinois, for the arrest
of defendant.   On his arrival at San Francisco in the "City
of Sidney," defendant was arrested, on the warrant of the
Governor of California, and delivered to Frank Warner, the
messenger named to receive him, and was by him brought
into this State, and delivered into the custody of the sheriff
of Cook county, where the indictment on which he was after-
wards tried was found, and was then pending in the Criminal
Court against him.   Other matters are contained in the plea,
but as they are not necessary to an understanding of the
discussion that is to follow, they need not be stated.

A proposition asserted by counsel for the defence is, the
Criminal Court of Cook county never obtained jurisdiction of
defendant by "due process of law," for the purpose of trying
him for larceny, or any other crime.   The position taken on
this branch of the case is much weakened by the considera-
tion, it appears from the averments of the plea itself the
bringing of defendant *into* the State trying him for an offence
committed within its limits, *was* by "due process of law,"
whatever wrong may have been done to him elsewhere.   The
Governor of the State of Illinois made a requisition upon the
Governor of the State of California for the surrender of de-
fendant as a fugitive from the justice of the State, and desig-
nated Frank Warner to receive defendant and bring him back
to this State.   In compliance with that requisition, the Gov-
ernor of California did issue his warrant, upon which defend-
ant was arrested within the jurisdiction of that State, and

delivered into the custody of Frank Warner, who brought him into this State, and delivered him to the sheriff of Cook county. That was in accordance with usage and law. It is not allowable, on the trial of one who has been surrendered by a sister State, under the laws of Congress, as a fugitive from justice, to inquire as to the regularity or irregularity of such surrender. It affects neither the guilt nor innocence of the accused, nor the jurisdiction of the court to try him. Conceding, as may be done, defendant was arrested in Peru, and brought into the State of California, without warrant of law, the State now prosecuting defendant was not a party to any violation of any treaty or other public law. The application the State made to the executive department of the general government was for the legal arrest of defendant, and if there was any abuse of the warrant of the Federal government, or any treaty obligations with a friendly power violated, it was not done by the State now conducting the prosecution against defendant. Julian, whom it is alleged made the illegal arrest of defendant, and brought him within the jurisdiction of the State of California, was acting either under the warrant of the President or on his own responsibility. He did not bring defendant into this State at all. It was done by another person, on a requisition from the Governor of Illinois, and on a warrant issued by the Governor of California for his arrest in that State. Of the action of the State prosecuting him, defendant can have no just ground of complaint that he was brought within its jurisdiction without "due process of law." *The People* v. *Rowe,* 4 Parker's Cr. Rep. 253; *Adriance* v. *Lagrave,* 59 N. Y. 110; *The State* v. *Ross,* 21 Iowa, 467.

But waiving every objection to the plea that may seem to be technical, and considering it on the broadest grounds taken in its support, it is thought the demurrer was properly sustained. Three propositions are stated, which, if they can be maintained, it is insisted lead to the conclusion the Criminal

Court of Cook county never obtained jurisdiction of defendant to try him for larceny or any other crime: First, that the United States, by its treaty with the republic of Peru, provided "due process of law" for getting jurisdiction of persons domiciled in that country charged with having committed certain crimes, among which is larceny, of which defendant was charged in one count of the indictment against him; second, that such "due process of law" must be obeyed in all its terms, expressed or implied; and third, that such "due process of law," for the purpose of getting jurisdiction in such cases, by necessary implication excludes any other mode of getting jurisdiction. As has been seen, defendant was not, in fact, brought within the jurisdiction of the United States under its treaty with Peru; but the argument assumes that if defendant was brought back to the United States otherwise than under the treaty between the United States and Peru, his capture and detention would be unlawful, as being in violation of a right of asylum he is supposed to have had, under the treaty, at the place he was domiciled when captured. No principle is suggested on which this proposition can be maintained as broadly as stated, nor is any case, English or American, cited where the decision was rendered, on analogous facts with the case being considered, that holds the doctrine contended for. Undoubtedly at common law the rule is, the court trying a party for a crime committed within its jurisdiction will not investigate the manner of his capture, in case he had fled to a foreign country and had been brought back to its jurisdiction, although his capture had been plainly without authority of law. It is sufficient the accused is in court, to require him to answer the indictment against him. It is thought, and with good reason, any other rule would work great embarrassment in the administration of the criminal law. In *Ex parte Scott*, 9 Barn. & Cress. 446, the accused was arrested at Brussels by a police officer, without any warrant of law, and brought back to England. The prisoner was

brought up on *habeas corpus*, that she might be discharged. It appeared a true bill had been found against her for a misdemeanor, and Lord Tenderden, before whom the writ was heard, refused to inquire into the circumstances of her arrest, whether it was legal or illegal, and held the accused amenable to justice. It was said in that case, if the act complained of were done against the law of a foreign country, that country might have vindicated its own law. It does not seem to be doubted that this case accurately states the common law on this subject, nor is it doubted that many well-considered American cases declare the same doctrine. *The State* v. *Smith*, Bailey's (S. C.) Law Rep. 281, and note; *The State* v. *Brewster*, 7 Vt. 118; *Adriance* v. *Lagrave*, 59 N. Y. 110; *The State* v. *Ross*, 21 Iowa, 467; *United States* v. *Caldwell*, 8 Blatchf. 131; *United States* v. *Lawrence*, 13 id. 295. The rule is different in civil cases, for the reason a party guilty of fraud in bringing a party within the jurisdiction of the court will not be permitted to have a personal advantage from his own wrongful conduct.

It may be well to recur again to the distinction taken by counsel which it is insisted takes the case being considered out of the rule established by the English and American cases cited, that some further discussion may be had upon it. The position taken is, that where a treaty exists between two governments, as no capture can lawfully be had of a party accused of crime, in the country to which he has fled for asylum, except under the terms of such treaty, if a capture and removal of a party is made in violation of the treaty, it is without "due process of law," and the court within whose jurisdiction the accused is wrongfully brought obtains no rightful jurisdiction to try him for any crime,—either for the crime for which it was attempted to extradite him, or for any other crime. The exact question arising in this case was not involved in either of the cases *ut supra*, nor, indeed, has

the attention of the court been called to any case where the facts were precisely analogous.

It is confidently insisted all through the argument for the defence, that defendant's right of asylum, under the treaty between the two governments, was complete when he was domiciled in Peru, and that he has been deprived of that right by sheer force, without "due process of law." But is that position tenable? Upon what principle can it be maintained? As a question of law, on the facts as stated in the plea, defendant never had any right of asylum in Peru that would secure him immunity from arrest on account of offences mentioned in the treaty, and for which a party was subject to extradition. Conceding, as may be done for the purposes of this decision, the proposition insisted upon, the enumeration of certain crimes in the treaty for which a party may be extradited implies that as to all other offences he is guaranteed asylum in the country where he is domiciled, how does that, if true, affect the question being considered? As to the crime of larceny, with which defendant was charged, he could have no right of asylum in Peru, as that is one of the crimes enumerated in the treaty, and what right secured by treaty was violated when he was arrested, either with or without due process of law? The accused was subject to extradition at any time, under the treaty, and what difference can it make, in law, as to the right of a State court to try defendant for an extraditable crime, whether the existing treaty was, in fact, observed in all its forms? That which was done, if wrong, was in violation of international law, and if the government of Peru does not complain of the arrest of defendant within its jurisdiction, as an infraction of international law, it does not lie in the mouth of defendant to make complaint on its behalf. Questions arising under international law concern principally the nations involved, and their settlement is a national affair.

Rejecting, as must be done, the erroneous assumption defendant had the right of asylum in Peru under the treaty between the two governments, and the argument for the defence is wholly without force. It is plain he had no right of asylum the law of either government would protect. The treaty as to the crime of larceny, with which defendant stood indicted, had provided no asylum that would secure him immunity from arrest for that crime in the country where he was domiciled. The utmost that can be claimed is, that the person having the President's warrant for the extradition of defendant proceeded irregularly, and may have rendered himself liable as for a personal trespass, but he deprived defendant of no right of asylum in the country of his temporary domicile, for the simple reason he had none secured by any public law, of which he could be dispossessed.

The attention of the court has been called to *Commonwealth* v. *Haines*, 13 Bush, 700, *The State* v. *Vanderpool*, 16 Vol. C. L. N. 34, and other analogous cases, upon which great stress is laid, as holding principles it is insisted ought to control the present decision. These cases have been examined, and it is found they hold the doctrine a fugitive from the justice of the State who has been brought back from the country to which he had fled, on a warrant of extradition, in conformity with the terms of a treaty existing between the two governments, can not be proceeded against or tried by the State for any other offences than those mentioned in the treaty, and for which he was extradited, without first being afforded an opportunity to return to the country whence he had been brought. Some of these cases also declare the familiar principle of international law, that the right of one government to demand and receive from another the custody of an offender against its laws, and who has sought an asylum in such foreign country, depends upon treaty stipulations between such governments. Where no treaty exists, no obligation that can be insisted upon exists to surrender criminals for trial to the

government from which they have fled; but as a matter of comity between nations, great offenders are usually surrendered on request from the government claiming the right to try them. A principle running through this latter class of cases has much that commends itself to a sense of justice. It is, that where a person whose extradition has been granted for trial for a particular crime named in the extradition warrant, the demanding government obtains no lawful right to try him for any other offences, without bad faith to the government that consented to his extradition, and for which it would have just grounds to demand reparation. Such an act would be in violation of both the letter and spirit of the treaty. But this doctrine, if it shall be conceded it has for its support natural justice, and even the weight of authority, can have no application to the case being considered. Here, the complaint is, the treaty was not observed in the capture and detention of defendant. It was done by force, outside of its provisions. The extradition warrant issued by the executive of the United States demanded defendant should be surrendered on a charge of larceny, that he might be tried for that offence. That is an extraditable crime under the treaty with the government of Peru. It was on that charge he was put on trial. It is true he was not convicted of larceny as at common law, but the same indictment contained counts for embezzlement, an offence of which, if convicted, the statute declares "he shall be deemed guilty of larceny," upon which he was tried at the same time of the trial of the charge of larceny, and was convicted.

There is another reason that leads to the same conclusion the case in hand is not within the rule declared in the latter line of decisions. It is, that defendant, as has been seen, was not surrendered by the government of Peru under its treaty with the United States. According to the averments in the plea, no effort was made to obtain defendant on the extradition warrant, and the official authorities of Peru were

not asked to, and never did, consent to his capture within the jurisdiction of that government. It was done by sheer force, and not under the treaty at all. That brings the case more nearly under the decisions first cited, and they must be regarded as of controlling authority.

But aside from all authority, on principle defendant has shown no right to immunity from prosecution for the offences for which he was indicted. The Federal government has itself violated no treaty with the republic of Peru. The arrest and detention of defendant was not by any authority of the general government, and no obligation is implied on the part of the Federal or any State government, to the republic of Peru, to secure defendant immunity from prosecution for any offence. What was done was done by individual wrong, precisely as was done in *Ex parte Scott, supra,* and *The State* v. *Brewster, supra.* The invasion of the sovereignty of Peru, if any wrong was done, was by individuals, perhaps some of them owing no allegiance to the United States, and not by the Federal government. Should the government of Peru complain its sovereignty had been invaded by citizens of the United States, that would be a question arising under international law, and not under any act of Congress or treaty of the United States. Nor will defendant be permitted to complain that his right of asylum in Peru has been violated, for, as before stated, he had no right of asylum, as against the crime of larceny, under the treaty with Peru, nor any absolute right to asylum under comity existing between nations. Whether a nation will surrender a fugitive from justice that seeks with it an asylum, is a question of national comity resting in discretion. In no view that can be taken is defendant entitled to immunity from prosecution on the indictment under which he was convicted.

Errors have been assigned that affect the merits of the case on the trial, that must be considered. That defendant

converted to his own use large sums of money and securities belonging to the firm of Preston, Kean & Co., or to other persons in their care or custody, admits of no doubt. There is no pretence he is not guilty of criminal conduct. The objections taken to the legality of his conviction are of the most technical character.

The point is made there is a variance in the pleading and the proof. It is alleged in the indictment the funds and securities embezzled were the personal goods of David Preston, Samuel A. Kean and Elisha Gray,—a co-partnership under the name of Preston, Kean & Co.,—and the insistence is, the firm, in law, was composed of David Preston, Samuel A. Kean and James Payne, with Elisha Gray as special partner. Certified copies from the record and files of the county clerk's office show the formation of a limited partnership, pursuant to the provisions of the statute, and that the firm was at one time composed of David Preston, Samuel A. Kean and James Payne, as general partners, with Elisha Gray as special partner. That was in May, 1881. The oral testimony given, shows that in November, 1881, the special partnership ceased, and since then the firm, as a matter of fact, has been composed of David Preston, Samuel A. Kean and Elisha Gray. The partnership articles of May, 1881, were made a matter of record, but it does not appear there were any partnership articles after that date, and it is insisted it is not legal to show by oral evidence, as was done, that Payne ceased to be a partner in November, 1881. The objection taken rests on section 12, chapter 84, of the Revised Statutes of 1874, which provides no dissolution of a limited partnership shall take place, except by operation of law, before the time specified in the certificate made a matter of record, unless a notice of such dissolution is also recorded in the same registry, and other provisions of the statute complied with. The time for the duration of the partnership under the articles of May, 1881, had not expired in November, 1881,

when an agreement was made between the partners that Payne should cease to be a partner, and Gray should become a general partner. The firm name continued as it was, but no notice of the change of the persons composing the firm was made a matter of record, nor was any other public notice given, as the statute requires shall be given. On account of the non-compliance with the statute in this regard, it is said the firm should be regarded as still being composed of the same persons as composed it under the articles of May, 1881. That may be true as to creditors and persons dealing with the firm without actual notice, but as between the partners themselves, Payne had no interest whatever in the firm assets after the agreement he should cease to be a partner. It is sufficient, under the law of this State, that the property is alleged in the indictment to belong to the persons who in fact own it, or have a special interest in it. That was done in this case, and there is no variance between the proof and the allegations of the indictment in this respect.

It is insisted the evidence shows a cumulation of offences, and for that reason it was error in the court to deny defendant's motion to compel the prosecution to elect upon what alleged act of larceny or embezzlement a conviction would be asked. The court, by its ruling, submitted all the evidence touching the embezzlement of funds and securities by defendant, to the jury, and it is not perceived how it could properly have done otherwise. Embezzlement is a crime defined by statute, and it was entirely competent for the legislature to declare what acts would constitute the crime, and fix the measure of punishment. One element that enters into the statutory definition of embezzlement, is the fiduciary or confidential relation. Such relations afford the amplest opportunity to misappropriate money, funds and securities, and often present great difficulty in proving exactly when and how it was done. This is especially true with regard to clerks and confidential agents in banks, or other corporations or

firms doing a large business, and who are intrusted, in whole or in part, with the care or custody of funds, securities and property belonging to banks or other corporations, or to a co-partnership. It is difficult, in such cases, if at all possible, to prove with certainty when or how the embezzlement was effected. It is, of course, done with a view to avoid detection, and the confidential relations existing ward off suspicion. Embezzlement may, and most often does, consist of many acts done in a series of years, and the fact at last disclosed that the employer's money and funds are embezzled is the crime against which the statute is leveled. In such cases, should the prosecution be compelled to elect it would claim a conviction for only one of the many acts of the series that constitute the *corpus delicti*, it would be doubtful if a conviction could be had, under sections 75 and 76 of the Criminal Code, against a clerk in a bank or other corporation, or a co-partnership, although the accused might be conceded to be guilty of embezzling large sums of money in the aggregate. It might be otherwise or different, under section 74 of the Criminal Code, where distinct sums of money or articles of personal property are or may be delivered to the accused on different occasions wide apart. Such distinct acts might very readily be susceptible of direct proof, for the act of delivery implies actual knowledge in some one who could be a witness. But no such opportunity is afforded to make direct proof as to acts done, under sections 75 and 76, defining embezzlement. The body of the crime consists of many acts done by virtue of the confidential relations existing between the employer and the employe, with funds, moneys or securities over which the servant is given care or custody, in whole or in part, by virtue of his employment. The separate acts may not be susceptible of direct proof, but the aggregate result is, and that is embezzlement. To avoid the difficulty, no doubt, that might be encountered in making proof in such cases, it is provided by statute, (section 82 of

the Criminal Code,) in the prosecution for the offence of embezzling, fraudulently converting to one's own use, or fraudulently taking or secreting with intent so to embezzle and convert, the bullion, money, notes, bank-notes, checks, drafts, bills of exchange, or other security for money, by a cashier or other officer, clerk or agent of such person, bank, incorporated company, or corporation or co-partnership, it shall be sufficient to allege, generally, in the indictment, an embezzlement, fraudulent conversion or taking, with such intent, funds of such person, bank, incorporated company or co-partnership, to a certain value or amount, without specifying any particulars of such embezzlement. Indeed, in the very nature of the crime, it would be impracticable in most cases to do more. The case being considered shows, in a marked degree, the necessity for the rule provided by statute, otherwise it would be difficult to make the proof and the allegations of the indictment correspond. On the trial the same liberal rule for the detection and punishment of persons guilty of misconduct, by reason of their confidential relations with their employer, prevails, for it is provided in the same section of the Criminal Code, evidence may be given of any such embezzlement, fraudulent conversion or taking, with such intent; and it shall be sufficient to maintain the charge in the indictment if it is proved that any bullion, money, note, bank-note, check, draft, bill of exchange, or other security for money, of such person, bank, incorporated company or co-partnership, of whatever value or amount, was fraudulently embezzled, converted or taken, with such intent, by such cashier, or other officer, clerk, agent or servant. Under this rule, which is certainly a wise one, it was proper the court should permit all the evidence of what defendant did by reason of his confidential relations with the banking firm whose clerk he was, to go to the jury, as was done, and if the jury found, from the whole evidence, any funds or securities for money had been embezzled or fraudulently converted to his

own use by defendant, it was sufficient to maintain the charge of embezzlement, as that crime is defined in the 75th and 76th sections of the Criminal Code. Any other rule would render it exceedingly difficult to secure a conviction under either of these sections of the statute. The view taken by the defence, of this statute, is too narrow and technical to be adopted. It has a broader meaning, and when correctly read, it will embrace all wrongful conduct by confidential clerks, agents or servants, and leave no opportunity for escape from just punishment on mere technical objections not affecting the guilt or innocence of the party accused. The cases of *Kribs* v. *The People*, 82 Ill. 425, and *Goodhue* v. *The People*, 94 id. 37, cited by the defence, were prosecutions for embezzlement under other sections of the Criminal Code, and illustrate no phase of the case being considered. There was no error in the court refusing to require the prosecution to elect for what particular act of embezzlement a conviction would be asked.

The last ground of objection is, the verdict is without evidence, and against the law. Ordinarily, whether there is evidence to warrant a conviction, is a question for the jury, the court taking care always to see that no manifest injustice is done. With that view the evidence has been considered. It is seen the testimony of other witnesses, taken in connection with defendant's letter to the banking firm, written on the eve of his departure, with the schedule attached of securities and money embezzled, constitutes ample proof of the *corpus delicti*. It would answer no good purpose to enter upon an analysis of the evidence,—it is sufficient to state the conclusion reached.

But whether the verdict is contrary to law is a question for the court, and that has been fully considered. The objection in this regard goes to the extent, that, admitting all the evidence tends to prove, it does not constitute embezzlement, under the 75th section, or any other section of the Criminal Code. The argument on this branch of the case is

based on a misconstruction of that section of the Criminal
Code defining the crime of embezzlement. There are two
counts in the indictment that charge defendant with embez-
zlement. On examination it will be seen they are both sub-
stantially in the language of the statute, and that is all the
law requires. In the first count it is charged defendant em-
bezzled securities for money, gold coin and other funds and
property of Preston, Kean & Co., "then and there intrusted"
to defendant; and in the second count it is charged defend-
ant, being then and there a clerk in the employ of Preston,
Kean & Co., fraudulently and feloniously did, without then
and there having the consent of such firm, embezzle and
fraudulently convert to his own use a large amount of the
personal goods, funds and money,—all of which is described
with sufficient particularity,—which personal goods, money
and funds "then and there came to the possession" of de-
fendant "by virtue of such employment." It will be observed
the 75th section of the statute, under which the second count
in the indictment was evidently framed, makes it an offence
for a person occupying such confidential relations to embez-
zle property of his employer, or that of another that comes
to his possession or under his care, or to secrete the same
with intent to do so, by "virtue of his employment" with the
owner or owners. The words "under his care," found in the
75th section of the statute, are not used in this second count
of the indictment, and it is contended the proof fails to show
the funds and property alleged to have been embezzled were
ever in the *possession* of defendant by virtue of his employ-
ment, and for that reason it is said he is not guilty under
this count. The word "care," as used in the statute, is the
equivalent of "custody," and may mean "charge," "safe-
keeping," "preservation," "security," and it would seem it
was in that sense it was used in the statute. "*Possession*,"
as used in the same section, has perhaps a slightly different
and broader meaning than the word "care," but it may also

mean "to keep," "to take or seize hold," "to hold or occupy,"
as the owner of property would or might do.    It matters little
whether one or both words were used in the indictment.    A
close reading of the testimony will show the funds embezzled
were quite as much in the *possession* of defendant as under
his *care*.    It is idle to say, in view of the relations defendant
sustained to the banking firm, as disclosed by the testimony,
that the funds and securities in the vaults were not in pos-
session of defendant and other persons employed about the
bank, and who had access to such funds and securities, for
one purpose or another.   If the indictment can not be main-
tained on the ground the funds and securities embezzled were
in the *possession* of defendant, as that term is used in the
statute, by virtue of his employment, it could not had it been
alleged they were under his care, or had it been charged they
came both to his possession and under his care by virtue of
his employment; and the case would be presented where a
clerk converted to his own use $44,000 of his employer's
money and securities, and yet guilty of no crime, within the
meaning of this section of the statute.    So narrow a con-
struction as that insisted upon would render nugatory this
section of the statute which defines embezzlement by clerks
and confidential agents.

It seems to be claimed as to the money, bonds and prop-
erty alleged to have been embezzled of his employers, the
taking of them out of their vaults by defendant was larceny at
common law, and therefore could not be embezzlement, under
the 75th section of the Criminal Code.    No such subtle rea-
soning as that will satisfy the common understanding.    It is
not denied that defendant converted to his own use large
sums of money and securities belonging to the bank while he
was in its employ as a clerk, and that such funds did in *some*
way come to his possession.    How did he come to get pos-
session of such funds and securities for money, if it were not
by virtue of his employment?    Had he not been in the employ

of this banking house he could have had no access to their vaults. No attempt will be made to ascertain defendant's exact relation with the bank. It is enough to know his position, whatever it was, gave him access, for some purposes at least, to the vaults where the funds and securities were kept, and that brought the funds and securities embezzled, into his possession, or, what is really the same thing, under his care, in a measure, by virtue of employment. It was simply by virtue of his employment, and not otherwise, that he got possession of his employers' money and securities, and converted the same to his own use, and that is embezzlement, under the 75th section of the Criminal Code. It is that for which he was indicted and convicted, and it is the offence defined by the statute.

It is to be observed the statute of this State defining the crime of embezzlement is much more comprehensive than any English statutes on the same subject that we have examined, and especially that section which defines embezzlement by a clerk or confidential agent who converts to his own use funds belonging to his employer which may come to his possession or under his care by virtue of his employment, and the decisions of the English courts, construing their own statutes, do not in any way assist to a correct understanding of the statutes of this State on the same subject. Much of what is said by text-writers to which the attention of the court has been called was said with reference to English statutes, which are materially different from that section of the statute of this State under which defendant was indicted. On account of the dissimilarity of the statutes, it has not been thought necessary to remark upon English embezzlement statutes, nor upon the decisions of English courts construing them. Decisions have been rendered by courts of some of our sister States construing statutes substantially like section 75 of the Criminal Code of this State, that make the embezzlement of money or personal goods larceny, among which are *The Peo-*

*ple* v. *Sherman*, 10 Wend. 299, . *The People* v. *Dalton*, 15 id. 581, and *Lowenthal* v. *The People*, 32 Ala. 589. So much of the reasoning in the opinions in the cases cited as is applicable to the present decision may be read as being in harmony with the views expressed in this opinion.

No error affecting the merits of the case appearing in the record, the judgment is affirmed.

*Judgment affirmed.*