WILLIAM F. WILLIAMS, PLAINTIFF IN ERROR, v. A. H. WEBER, SHERIFF, ETC., DEFENDANT IN ERROR.

1. EXTRADITION OF FUGITIVES FROM JUSTICE.—Under the national compact with the states relating to the return of fugitives from justice, such persons obtain no right to protection against the state whose laws they have violated by fleeing within the boundaries of another state whose laws they have not broken.

2. TRIAL OF FUGITIVE FOR A DIFFERENT CRIME.—When such a person has been returned from another state to this state by a requisition, he may be arrested and tried for a crime committed before he left, although not the same crime with which he was charged when extradited.

*Error to District Court of Arapahoe County.*

Mr. J. W. LEWIS, for plaintiff in error.

Mr. S. W. JONES, attorney general, and Mr. H. RIDDELL, for defendant in error.

BISSELL, J.  Williams, the plaintiff in error, having been taken into custody by the sheriff under a warrant issued by a peace officer, sued out a writ of *habeas corpus* to secure his release, because, as he claimed, the detention was illegal.

A complaint charging him with obtaining money under false pretenses was filed before a justice of the peace in Ara-

pahoe county, in July, 1889. At that time Williams was in Kansas, where he went after the alleged offense was committed. Upon the complaint and warrant an application was made to the executive for a requisition on the governor of Kansas for the arrest and return of the alleged fugitive from justice. The requisition was honored, and Williams was arrested and brought back to Denver for trial. After a hearing he was discharged, but was immediately re-arrested on another warrant issued on a complaint which charged him with an offense under the chattel mortgage act. The crime, if any, was committed by the sale of mortgaged chattels without the knowledge or consent of the mortgagee. It is probably true that the defendant had committed but the one offense, and that the acts done would not constitute a crime unless they were adjudged to be a violation of the act relating to the disposition of mortgaged property. According to the view taken of the case this matter is of slight importance. The offense for which he was re-arrested was undoubtedly radically and legally different from that on which he had been brought from the neighboring state. It was insisted on his behalf, that under the constitution and law he could only be tried for the crime wherewith he was charged according to the tenor of his extradition, unless he was granted time and opportunity to return to the jurisdiction whence he had been brought by the original proceedings against him. No other question is presented by the record or discussed by counsel. The cause was transferred from the supreme court, by its order based on the statute and the stipulation of parties. Since the case comes to us under such circumstances and in this condition, we cannot well escape deciding the matter. Every court which has passed on the question must have been impressed with the diversity of judicial opinion on this subject. As may be gathered from the decisions, the differences between the courts do not seem to have arisen from the complexity or the difficulty of the inquiry. A tender and hardly commendable solicitude for the personal rights and liberties of those accused of crime

has led many courts to be astute in the erection of barriers to the successful prosecution of crime. On the other hand there are many tribunals which have not failed to recognize the justice and exact logic of the principles established by the common law courts of England, and have adhered closely to the decisions which they have rendered. On the question presented by this record those decisions are uniform and concurrent, and are approved by the current of judicial authority in this country. At the common law, an individual could be tried and convicted for any crime known to the jurisdiction in which he was arraigned, regardless of the means used to bring him within that jurisdiction, or of the circumstances under which he was found therein. Unless there were other grounds upon which the court's jurisdiction could be successfully assailed, or the proceedings were in some way irregular, the only available plea was not guilty. When the matter was first presented, these courts unhesitatingly held that the prisoner could not be heard to defend on the ground that by force, fraud or covin he had been gotten within the jurisdiction where he was being tried. According to the right reason of the case the judges said that was a matter which concerned only the authorities of the country whence he had been brought. If the law of the country of the arrest had been outraged and violated, the guilty parties could easily be proceeded against under treaty stipulations, as they might exist, or under the general principles of international law, and the comity of nations, which were recognized as of binding force by all civilized countries. It is not denied that the prisoner might have a remedy against his captors. Possibly it would be more accurate to say that a right of action existed in his favor, since, as the learned justice said in the Ker. case, "whether he could recover a sum sufficient to justify the action, would probably depend upon the moral aspects of the case." Why this rule should ever have been doubted or questioned is not plain. Undoubtedly the tendency of American courts to go to extremes in the protection of the right of personal liberty has

VOL. I.—13

had much to do with it. The whole body of the criminal law has been disfigured by the more or less successful endeavors to engraft thereon a mass of rules, presumptions, and technical requirements, totally at variance with the general policy of the law and unnecessary either to the defense of the individual or the protection of the public.

The chief support of the opposing rule is drawn from the supposed analogy between proceedings for the extradition of criminals from foreign countries under treaty stipulations with their governments, and those taken under our own organic law. The analogy does not exist, the circumstances are totally different, and the reasons adduced in support of the one do not even tend to maintain the other. Whenever a treaty is entered into between nations which provides for the surrender of fugitives from justice, it attempts at least to define the crimes, determine the circumstances and specify the proceedings and proofs essential to a recognition of the right to demand the surrender of the accused person. The limitations to be deduced from the terms of treaties between foreign powers cannot be found in a constitutional requirement which amounts to an agreement between the states to surrender, on proper demand, all persons accused of crime. It is wholly unimportant what the crime is. The only inquiry at all essential is as to whether he is accused of that which the law of the demanding state has made a crime. The act may neither be a common law offense, nor yet one under the laws of the state of his refuge. The regularity of the demand is the sole matter for the consideration of the executive, and the inquiry as to the commission of the offense and the guilt of the accused is to be answered by the courts of the state demanding his return. The fugitive is not guilty, or innocent, as he may happen to be on one side or the other of the line which marks the limits of sovereignty of the different states. Territorial lines neither affect the question of guilt or innocence, nor do they operate to grant rights or immunities. Under our national system and compact, a fugitive from justice obtains no right to protection against the

state whose laws he has violated, by fleeing within the boundaries of another whose laws he has not broken. The constitutional provision under which his return is demanded was not intended for his benefit, nor can a defense be extracted from its terms. Its purpose was to secure the return and punishment of those who had violated the law, and it cannot be tortured by construction into a constitutional guaranty against punishment for crime. The present inquiry only concerns one who was brought by constitutional means within the jurisdiction of the court which was proceeding to try him. The authorities clearly support this position. *Ex parte* Scott, 9 Barns. & Cress. 446 (17 English Common Law 204); *The State v. Brewster*, 7 Vt. 117; *Dow's Case*, 18 Penn. State 37; *The State v. Smith*, 1 Bailey 283; *Mahon v. Justice*, 127 U. S. 700; *Ker v. The State*, 110 Ill. 627; *Ker v. The State*, 119 U. S. 437; *The State v. Ross & Mann*, 21 Iowa 467; *Ham v. The State*, 4 Texas Court of Appeals 647; *In re Mahon*, 34 Federal Reporter 525; *The State v. Stewart*, 60 Wis. 587. *In re Miles*, 52 Vt. 609.

The right of the court to try the plaintiff in error on a sufficient complaint, for an offense other than that on which by requisition he was brought from Kansas, must be upheld. If this case had come into the court by proceedings initiated subsequent to its creation, and counsel had raised and discussed the question, it might be that we would feel compelled to express an opinion as to the right of review in this class of cases. But the inquiry was not suggested by either side, and the parties unite in the statement that the only real question is as to the right to bring a fugitive into a state for one offense, and try him for another, and concur in the request for its settlement. It is a matter of such grave and present importance to the criminal jurisprudence of this state, that the matter was taken up, considered and determined without reference to any doubt which might arise as to the right of review in such cases. The judgment is affirmed.

*Affirmed.*