(No. 18879.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* LOUIS BERARDI *et al.*—(JOHN SHAPIRO, Plaintiff in Error.)

*Opinion filed October 25, 1928—Rehearing denied Dec. 7, 1928.*

ELWYN E. LONG, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, ROBERT E. CROWE, State's Attorney, and JAMES B. SEARCY, (EDWARD E. WILSON, and JOHN HOLMAN, of counsel,) for the People.

Mr. COMMISSIONER PARTLOW reported this opinion:

Plaintiff in error, John Shapiro, together with Louis Berardi, August Mirabella, Andrew B. Zilinski, Michael Sberna, Forrest W. Gray and Samuel Goldman, was indicted by the grand jury of Cook county for the robbery of the office of the American Railway Express Company in the LaSalle street station in Chicago and the theft of about $17,000. Mirabella entered a plea of guilty. Gray, Goldman and Sberna were granted separate trials. Shapiro, Berardi and Zilinski were tried together, they were found guilty and sentenced, and a writ of error has been prosecuted from this court by Shapiro.

The robbery took place about 1:30 o'clock in the afternoon of January 2, 1925. The actual participants were Mirabella, Berardi, Zilinski and Sberna. Berardi was captured during the robbery, and all four of them were identified by several witnesses who were present when the robbery took place. On the trial Gray, Goldman and Sberna testified for the State. Previous to the trial Shapiro had been convicted in the United States district court in Chicago for mail robbery and was in the Federal penitentiary at Fort Leavenworth, Kansas, under a ten-year sentence. A sworn petition was filed in the trial court on behalf of the State setting up these facts and alleging that the case had been set for trial, that the appearance of Shapiro was necessary, and that the Attorney General of the United States had consented that Shapiro be produced upon said trial. The prayer was that a writ of *habeas corpus ad subjiciendum* issue to the warden of the penitentiary to produce Shapiro in court to stand trial. The writ was issued and at the time for trial Shapiro was in court in the custody of a deputy United States marshal. Before the jury was selected, Shapiro, by his counsel, made a statement to the court relative to his prior conviction, his imprisonment, the issuance of the writ and the presence of Shapiro in court, and counsel insisted

that the court was without authority to issue the writ of *habeas corpus,* to be executed beyond the limits of the State, to produce Shapiro, who was serving a Federal sentence; that while this status continued Shapiro could not be legally tried in a State court; that two separate and distinct jurisdictions could not have legal custody of him at the same time; that the Federal government had not exhausted its jurisdiction. The motion was that Shapiro be remanded to the custody of the United States marshal. This motion was denied, and this ruling is assigned as error.

In *Ker* v. *People,* 110 Ill. 627, Ker was indicted in Cook county for embezzlement, larceny and receiving stolen property. He was located in Lima, Peru, South America, and steps were taken to have him extradited under a treaty between the United States and Peru. A presidential warrant was issued and Henry G. Julian was appointed as messenger to receive defendant from the authorities in Peru. It was alleged that no request was made of the Peruvian authorities by the United States consul at Lima, or by Julian, for the surrender of Ker in compliance with the presidential warrant, but that Julian, without any authority or warrant, arrested Ker, forced him to accompany Julian to San Francisco, where he was arrested on a warrant issued from Cook county and returned to Illinois on a requisition from the Governor. A plea was filed to the jurisdiction of the court, all these facts were set up, and it was urged that the court did not have jurisdiction over the defendant. It was held that at common law the court trying a party for a crime committed within its jurisdiction will not investigate the manner of his capture in a foreign State or country though his capture and return may have been without authority of law,—and that is the rule in this State; that an illegal arrest, and the fact that Ker was brought to this country forcibly, did not deprive a court of this State of jurisdiction to try him for an offense charged against him. The case

went to the Supreme Court of the United States, where the judgment was affirmed. (119 U. S. 436.) The same rule is announced in *United States* v. *Rauscher*, 119 U. S. 407, and *Mahon* v. *Justice*, 127 id. 700.

In *People* v. *Klinger*, 319 Ill. 275, it was held that where a defendant is returned to this State for trial on a requisition the courts of this State will not inquire into the regularity or irregularity of such proceedings; that such question affects neither the guilt nor innocence of the accused nor the jurisdiction of the court to try him; that the fact that the accused is in court is sufficient to require him to answer the indictment against him.

In *Ponzi* v. *Fessenden*, 258 U. S. 254, it was held that it is the duty of the Attorney General of the United States to look after the safety and custody of Federal prisoners; that he represents the United States in this respect, and that he may, on behalf of the United States, practice that comity which the operation of the State and Federal courts requires, provided he does not prevent the enforcement of the sentence of the Federal court or endanger the prisoner; that a prisoner, with the consent of the Attorney General, may, while serving a sentence imposed by a Federal court, be lawfully taken on a writ of *habeas corpus* into a State court and put on trial upon an indictment pending against him.

The facts in the *Ponzi case* are almost identical with the facts in this case, except that Ponzi was confined in a prison in Massachusetts upon a Federal charge at the time the writ of *habeas corpus* was issued and the writ was issued by a court of that State. Therefore the writ was to be executed within the limits of the State, whereas in this case the writ was to be executed, if at all, outside of the State. It must be conceded that the writ could not be executed or enforced outside of the State, and the court issuing it had no jurisdiction over the warden of the Federal penitentiary in Kansas, and if the Federal authorities had seen fit to disobey

the writ the court would have been powerless to have enforced it. The Federal authorities, however, never questioned the writ and are not questioning it now. They were willing to obey it. They did obey it and brought Shapiro into court and submitted him to the jurisdiction of the court, which they had a right to do under the rule announced in the *Ponzi case*. Shapiro was in no position to question the jurisdiction of the court, and the court properly overruled his motion and placed him on trial.

Complaint is made that the court unduly limited the cross-examination of Sberna. The witness testified that the day after he made his confession he met Shapiro in the presence of various officers. He was asked what was the first thing Shapiro said to him at that time, and an objection was sustained to the question. The witness then said that his confession was read to Shapiro by an officer, and he was asked what Shapiro said after it was read and whether Shapiro denied anything contained in the confession. An objection was sustained to these questions. All of these objections were properly sustained, because the questions were not proper cross-examination. The State, in chief, asked for no conversation with Shapiro, and the cross-examination was properly limited to the matters gone into in the direct examination. If there was a material conversation at that time, Shapiro, or anyone present when the conversation took place, could have testified to it at the proper time, thus avoiding any injury to Shapiro, but no witness was called for that purpose.

Error is assigned on the refusal to give the eighth instruction on behalf of Shapiro, which told the jury that a self-confessed accomplice, upon his confession and admission of participating in the perpetration of the crime, stands contaminated with guilt, and it was the duty of the jury, in weighing and considering such testimony, to take into consideration the fact that such accomplice had pleaded guilty and may have testified from motives of reward or

expectation of leniency, and in applying the test of credibility to the testimony of such accomplice it was the duty of the jury to consider the same with grave care and caution before acting upon it, and if, after considering such testimony, the jury were not satisfied, beyond a reasonable doubt, of the truth of the same against Shapiro, they should not in any way permit such testimony to influence their verdict against Shapiro. Plaintiff in error submitted five instructions on the question of an accomplice, the second of which was given. It covered all of the elements contained in the eighth instruction refused. It warned the jury that the testimony of an accomplice should be received with great care and caution and be subjected to careful scrutiny; that it was not to be received the same as the testimony of an ordinary witness; that the law presumed that the testimony of an admitted criminal should be subject to the most careful inspection; that if the testimony of an accomplice, together with all of the other testimony, raised a reasonable doubt of the guilt of the defendants, or either of them, they or he should be found not guilty. Plaintiff in error had the right to have the jury fully instructed on the question of an accomplice, but he did not have the right to have the same subject matter repeated in various other instructions. For this reason the eighth instruction was properly refused.

Defendant Gray testified that he had known Shapiro since December 15, 1924. He first met him in regard to a case in the morals court. He met him in December, 1924, at 801 Cass street, Chicago, through Goldman. At that time witness was a car-loader for the American Railway Express Company at the LaSalle street station, and he and Goldman roomed at 801 Cass street. On December 15, Shapiro asked witness if he was employed by the express company, and he replied that he was. Shapiro wanted to know how many men were employed at the LaSalle street station, and was told that there were about 275 and the

pay-roll was between $17,000 and $20,000. Shapiro asked witness what was the use of working for a living when they could earn money easily. Witness said he did not know whether he wanted to enter that line of work. Shapiro assured him there was nothing to fear; that he had strong political influence and would get witness out if he got into trouble. Shapiro said he would send several men to talk to witness and Goldman about the robbery. On December 20 Mirabella and Zilinski went to see witness, and on December 24 there was a meeting of all seven of the parties at 801 Cass street, where the final arrangements were made. Witness was in another room while the others were talking but heard them. Shapiro asked Mirabella if he was ready to pull the robbery. Mirabella said he was ready but he wanted to know how the money was to be divided. Shapiro said that the four men who did the actual work would get sixty per cent, fifteen per cent would be laid aside for lawyers' fees, and the other twenty-five per cent would be divided among Goldman, Shapiro and witness. Mirabella objected to this, and Shapiro said, "I am running this gang and you will do as I tell you, and if you don't we will call this robbery off." Mirabella then consented to the division and witness was called in and informed as to the arrangements and consented to them. On the day of the robbery witness went to the LaSalle street station and into the office of the cashier about 1:30 P. M. to see whether the pay-roll had arrived. He remained there until it arrived, and a few minutes later he went out on the corner and signaled to the four persons who were to do the robbing. They went into the station, held up the office, secured the money, and all of them escaped except Berardi. Immediately after the robbery all of the parties except Berardi met at the home of Shapiro, where the money was divided according to the agreement made.

Defendant Goldman testified that in December, 1924, he met Shapiro nearly every day at an attorney's office in Chi-

cago, where he was engaged as an investigator. He told Shapiro he was acquainted with Gray, who had told him there was from $20,000 to $25,000 to be secured from the LaSalle street pay-roll. Shapiro said he had somebody to pull the job; that he expected a call from Mirabella, who owed him some money; that he wanted Mirabella to get busy on the job and wanted witness to meet him. Goldman testified to various conversations and meetings with Shapiro and the other defendants, including the meeting where it was agreed as to the manner in which the proceeds of the robbery were to be divided. This conversation was substantially the same as detailed by Gray. Goldman took no active part in the robbery but was present at the time the proceeds were distributed and received his share.

Defendant Sberna testified that about the middle of December he began talking about the LaSalle street robbery. The first men he talked to were Goldman and Mirabella. They were in the store of Goldman's brother-in-law. The next day he saw Shapiro, who told him that he (Shapiro) would be willing to stand back of him if witness got into trouble, whether they got any money or not. He testified to the conversation with reference to the distribution of the money substantially as testified to by Gray and that the money secured from the robbery was taken to Shapiro's house and divided.

Several witnesses testified to seeing the four participants at the depot at the time the robbery took place. Shapiro denied all of the conversations as testified to by the other witnesses and denied all connection with the robbery. He testified to the various political offices he had held, and four or five witnesses testified to his general reputation as a law-abiding citizen.

Plaintiff in error sought to impeach the testimony of Gray by showing that his testimony on the trial did not correspond with his testimony before the United States

commissioner on the preliminary hearing; that at that time he testified that he first talked to Goldman about the robbery, whereas his testimony on the trial was that he first talked to plaintiff in error about it; that there were also discrepancies as to various dates given by him. Plaintiff in error insists that Gray and Goldman had been confined in jail and had fixed up their story.

Defendants Berardi and Zilinski were on trial with plaintiff in error but were not called as witnesses to dispute any of the testimony of the witnesses produced by the State. Neither was Mirabella called. They were all present at the time these conversations took place, and yet plaintiff in error relied upon a general denial of the conversations. Even if it be conceded that Gray was contradicted in some respects, he was corroborated by Goldman and Sberna. The evidence shows that plaintiff in error knew all of the parties who took part in this robbery. After the robbery he admitted that he assisted Sberna to get out of Chicago to a country place, where he was in hiding for a month. Plaintiff in error visited him there on several occasions and took Sberna's father to see him. It is inconceivable that this was done without his knowing that Sberna had been engaged in the robbery.

The evidence clearly establishes the guilt of plaintiff in error, and he was properly convicted. We find no reversible error, and the judgment will be affirmed.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Partlow is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Judgment affirmed.*