Conaway, J.
Petitioner, as appears from the pleadings and evidence on file in this cause, was indicted for, tried, and found guilty of, the crime of grand larceny at the November, A. D. 1890, term of the district court for Laramie county. The judgment and sentence of said court in pursuance of such finding was afterwards rendered, and a mittimus issued to respondent, which it is claimed is in accordance with such judgment and sentence. Respondent admits that he restrains petitioner of his liberty in the county jail of Laramie county, in the state of Wyoming, but alleges that such restraint is by virtue of said proceedings above recited and said resulting mittimus, and is lawful. Petitioner claims that such restraint is unlawful, and that petitioner is entitled to his discharge for several reasons.
We understood it to be admitted in the oral argument that only jurisdictional questions can be raised in this proceeding. Whether so admitted or not, such is clearly the law. Lack of jurisdiction of thesub-ject-matter, jurisdiction of the person, or jurisdiction to render the particular judgment assailed, seems to include all cases which render a judgment void or subject to collateral attack in habeas corpus. There is an apparent exception to this rule in some special cases, provided for by section 753 of the Revised Statutes of the United States, but this section has no application here. Jurisdiction of the person may be waived. Neither jurisdiction of the subject-matter nor jurisdiction to render the judgment can be conferred by waiver. Por illustration, a party, though not arrested or subject to arrest, or ha v-ing a good plea in abatement if arrested, may nevertheless voluntarily go to trial in a court of a justice of the peace, and thus submit himself to that jurisdiction. He may then be tried by the justice on any charge of crime which the justice has jurisdiction to try, and be adjudged, on conviction, to suffer any penalty fixed by law for the punishment of such crime which the justice has jurisdiction to impose. But, although the party thus submits his person to the jurisdiction of the justice of the peace, that court may not try him for a felony, or sentence him to be imprisoned in the penitentiary, or to be hanged.
The first reason assigned by petitioner for holding the judgment of the court below to be void, and for his discharge, is that he was arrested in Nebraska, and forcibly and against his will abducted from that state into the state of Wyoming, by a deputy-sheriff of Laramie county, Wyo., acting by the. ad vice of the prosecuting attorney of said county, assisted by 10 other persons, on November 7, 1890, these persons all being armed with rifles and revolvers. This is not denied by respondent, and it appears from the pleadings and evidence on file that it is substantially true, and that this abduction was followed by the arrest of petitioner in Wyoming on November 9, 1890, by another officer, by virtue of a warrant issued by a justice of the peace of said county, upon complaint in dueforro. chargingpetitioner with grand larceny. Thereupon he was by this last-mentioned officer delivered to respondent, the sheriff and keeper of the jail of said county, who has ever since detained him in said jail. On November 22, 1890, the grand jury presented to the district court of said county an indictment, charging petitioner with grand larceny. On the 3d day of December following he was arraigned on said indictment, to which he pleaded not guilty, and went to trial. He interposed no plea to the jurisdiction of the court at this time. He first seeks to take advantage of his forcible abduction from Nebraska to Wyoming by asking of the trial court the following instruction to the jury: “Ninth. The court instructs you that, in order to give this court jurisdiction to place the defendant upou his trial under a criminal charge, it is necessary that he be arrested under a legal process, in conformity to the laws of the state of Wyoming. Therefore, if you find from the evidence that the defendant was arrested by William C. Lykins, in the state of Nebraska, without having_ obtained a requisition for his extradition from said state, and forcibly and against the will of him, the said defendant, by the said William C. Lykins, as deputy-sheriff of Laramie county, Wyo., without any warrant for his arrest, abducted the said defendant from the said state of Nebraska, then, and in that case, the court instructs you that this court has not acquired legal jurisdiction to try him u'uder *569 the Indictment, and it is your duty to acquit him.” Leaving out of view the unintelligible portion of this proposed instruction, it is sufficiently apparent that it was inten led to raise the question of jurisdiction of the person. By no stretch of the imagination can it be conceived that the arrest of a defendant in a criminal ac- , tion without a legal warrant, or his ab- ( duction by force and against his will from ;! a neighboring state, could affect the gen-Ieral jurisdiction of the district court to try cases of grand larceny, or to pronounce judgment on convictions therefor, imposing the legal penalties. The effect of this instruction, if it had been given to the jury by the court as the law of the case, might have been to secure a verdict of not guilty by the jury without passing upon the merits of the case at all. Then that verdict would stand as a perpetual plea in bar to another trial, and the case never could be tried upon its merits. This is the reason of the rules requiring pleas in the nature of pleas in abatement to be filed at certain stages of the proceedings or not at all.. It may well be doubted whether the failure to interpose this objection to the jurisdiction of the person of petitioner upon arraignment and before pleading not guilty, and entering upon the trial, was not a waiver of the objection. But we prefer to discuss and decide this question upon broader grounds. Thecausehas been a subject of correspondence between the executive departments of the states of Wyoming and Nebraska. It has been spoken of as within the reach of those principles of comity which ought always to exist between these neighboring states. For this reason, if for no other, we would avoid placing the consideration or decision of this branch of this cause upon grounds that might appear at all technical, or as not reaching the merits of the controversy. Then, instead of asking, has petitioner waived his objection to the jurisdiction? let us ask, had he any valid objection available at any time in the progress of the cause? It is admitted to be the law that a fugitive from justice may be prosecuted in the state from which he fled, regardless of the means employed to secure his return. But it is claimed that when the officers of the state wrongfully abduct him from his place of asylum, and return him, the rule is different. The following cases are cited to this point: In re Allen, 13 Blatchf. 271; Lutten v. Benin. 11 Mod. 50; Ilsley v. Nichols, 12 Pick. 270. These are all civil cases, and were decided when arrests for debt were frequent. Neither do they make any distinction between wrongful acts of officers and wrongful acts of interested parties. It is the right of a party defendant in a civil action to be sued in the forum of his domicile, though he may be sued in a personal action in a foreign forum, if found there, if he went there voluntarily. If his presence there was procured by fraud or force, it does not subject him to a civil suit, or to the service of any civil process there. The cases cited have no reference to criminal actions.
No right of one accused of crime is violated by bringing him to trial in the jurisdiction where he is charged as having committed the crime. He can be brought to trial nowhere else. One other case is cited to the poin t under disc ussion, — the only one in any degree analogous to the case at bar. It is State v. Jackson, 30 Fed. Rep. 258, decided in the United States circuit court at Chattanooga, Tenn. Jackson was a citizen of the state of Illinois, and had never been in Tennessee. Consequently, he had never fled therefrom. This much was conceded. It was further found by the court that Jackson was illegally, and in violation of the constitution and laws of the United States, extradited from the state of Illinois, and brought within the jurisdiction of the courts of Tennessee by the respondents in said cause and by the state of Tennessee, its officers and agents, and was at the time of the hearing, in violation of the constitution and laws of the United States, detained and held in custody. L. P. Elliott, who illegally abducted Jackson, was the duly accredited agent of the state of Tennessee. Jackson was discharged. In the case at bar,it appears from the pleadings and evidence, that petitioner, although a citizen of the state of Nebraska, had recently before his abduction been in Wyoming, had committed a felony there, and had fled to Nebraska. No agent or officer of the state of Wyoming had been concerned in his abduction, or, so far as appears, had any knowledge of it. The cases cited do not establish the exception to the rule of law that courts will not regard the means employed to bring a fugitive from justice within the jurisdiction where heeommitted the crime. Neither does the case at bar fall within the exception as stated. The fact that a deputy-sheriff was of the party effecting the irregular and'illegal abduction does not *571 constitute the case an exception to the rule. Brookin v. State, (Tex. App.) 9 S. W. Rep. 735.[1] The better view, both in reason and by authority, seems to be that ■even an agent oi the state engaging in such lawless abduction does so in his character of a private individual, and does not make the state responsible for the wrong, or oust the jurisdiction of her courts. See Mahon v. Justice, 127 U. S. 700, 8 Sup. Ct. Rep. 1204. In the statement of facts in this last-mentioned ease it appears that Frank Phillips was the duly appointed and ac-ci’edited agent of the state of Kentucky to receive and bring to that state the fugitive, Mahon. Mahon had fled to West Virginia. A requisition was at the same time made by the governor of Kentucky upon the governor of WestVirginiafor the arrest and rendition of Mahon. There were three indictments against Mahon in Kentucky for murder. Pending negotiations between the two governors, the said Frank Phillips, with others whom the court calls his aids, violently seized Ma-hon, and brought him, against his will, into Pike county, Ky., where the warrants of arrest under said charge of murder were served upon him. It was necessary, in the decision of this case, for the court to pass upon the jurisdiction of the Kentucky court where the indictments were pending. The court (opinion by Justice Field) says: ■“The jurisdiction of the court in which the indictment is found is not impaired by the manner in which the accused is brought before it.” Andagain; “The process emanating from the governor of Kentucky furnished no ground for charging any complicity on the part of that state in the wrong done to the state of West Virginia.” And this language is used, notwithstanding this wrong was. done by the agent of the state of Kentucky and his aids. The governor of West Virginia exerted himself to the utmost to secure Mahon’s release, going into court himself for that purpose, but in vain. Mahon was remanded to custody. Much stress is laid in this connection upon a letter from the governor of Nebraska to the governor of Wyoming, requesting the release of petitioner on the ground that he had been forcibly and unlawfully abducted from Nebraska against his will. This letter is dated May 19,1891. How it could affect the jurisdiction of the court in December, 1890, when the trial, conviction, and sentence of petitioner occurred, is not apiparent. The correspondence between the two executives leading to this letter was begun with a communication from the executive of Nebraska, of date February 19, 1891, more than two months after such trial, conviction, and sentence. But it lies not in the mouth of this petitioner to raise this objection to the jurisdiction of the court before which he was tried and convicted. He is not the proper person to present to this court the claims of the state of Nebraska, or to exemplify to this courtcommuuications from her executive. He has suffered no wrong in being brought to trial and conviction. Pie is in no worse condition than if his arrest had been effected before he crossed the line into Nebraska, or by virtue of a requisition after his arrival there. That state has aright to complain, through her chief executive officer, of the invasion of her territory, of the violation of her sovereignty and her laws. This petitioner has no right to make the complaint for her, or to demand reparation, or to say what reparation shall be demanded. There is no reparation due to him, and he cannot speak for the state. And we know of no case where a state, having suffered such wrong, has ..demanded as reparation the release of a convicted felon. The case of Com. v. Shaw, decided by the court of common pleas of Clearfield county, Pa., in 1885, 6 Crim. Haw Mag. 245, has been cited, but is against the contention of petitioner. Norton and his partner, James Welsh, were railroad contractors. They were largely indebted at the completion of their contract, and collected the money due them, and decamped, without paying their debts. Upon this state of facts, a charge of embezzlement and conspiracy to cheat and defraud creditors was founded, and application made to the governor of Pennsylvania for a requisition upon the governor of.New York for the rendition of Norton. The governor of Pennsylvania refused the requisition. Norton was afterwards decoyed from Canada, where he had gone, to New Fork, and arrested on a warrant issued by a New York magistrate, but was forcibly and illegally abducted, and taken to Pennsylvania, where he was held to answer by a committing magistrate, and, in default of bail, incarcerated in the county jail. He sued out a writ of habeas corpus, and, on the hearing, offered to prove the manner of his arrest and detention. He was not allowed to do so, on the ground that a fugitive from justice *573 «annot, on his own demand,be set free because he was arrested in an illegal manner, and that the governor of New York had not made the demand for his release; and Norton was remanded. Afterwards, on his petition, the matter was laid before the governor of New York, and the governor of New York addressed a communication to the governor of Pennsylvania, inclosing the petition of Norton and other papers, showing the facts, and referring to Dows’ Case, 18 Pa. St. 37, and other authorities, and closing in the following words: “In calling your attention to the papers herewith transmitted, I desire to supplement them with the request, based upon the legal opinions before referred to, that, if consistent with your ideas of justice and executive power, you cause the release of the petitioner. ” It might well have been in accordance with the ideas of justice of the governor of Pennsylvania to release the prisoner, for he had refused a requisition for him in the same matter; .and it was, besides, sufficiently apparent that the promoters of the prosecution were making use of criminal process for the purpose of collecting debts. The governor addressed a communication to the president judge of the court having jurisdiction of the matter, inclosing the communication from the governor of New York, and closing as follows: “Ido therefore most respectfully and earnestly re ■questthat you cause the release of thepris-o.ner, Patrick W. Norton.” Norton was again brought before the judge on habeas corpus, 'and, after a hearing, discharged. He was not a convict. It is evident that the governor of Pennsylvania did notcon-sider him guiltj’ of the crime charged. His prosecutors had succeeded in bringing him by force within the state of Pennsylvania, notwithstanding the refusal of the governor of that state on demand for a requisition. In the case at bar, the governor of Wyoming is not asking for the release of petitioner. Neither is the governor of Nebraska, to our knowledge. If the correspondence between the two executives, which appears in the pleadings of the petitioner, came to us from the proper custody, and properly authenticated, it still does not purport to be all of the correspondence, or thelatest or final correspondence, on that subject. The communication from Nebraska’s executive asking for the release of the petitioner bears date May 19,1891. What has been done by either or both of the executives since that time we know not. It appears that the sovereignty of Nebraska was violated, and her criminal laws transgressed. It would seem that the release of a convicted felon in Wyoming would be a poor reparation for the indignity and wrong suffered by Nebraska. Such wrongs to state sovereignty have frequently occurred in all parts of the Uni ted States. Wehavenotyet been informed of a case where such a reparation has been demanded. It has always been the practice to disregard state and territorial lines in case of the hot pursuit of a criminal.
The indictment charges petitioner with the larceny of a number of neat cattle in Laramie county, Wyo., on the 10th day of October, 1890. Of this he was found guilty, and the value of the cattle stolen assessed by the jury at $600. It appears that his arrest in Nebraska, of which he complains as illegal and unauthorized, took place on the 7th day of November following. How long he kept the cattle in Wyoming, or by what route he removed them, or how hot the pursuit was, does not appear. When a felony has been committed, it is the right and duty of any person or persons, whether officers or not, to make the arrest. In case of their overlooking state lines, it has not been customary to scrutinize their conduct very closely, provided they arrest the right man. The opinion in Dows’ Case, supra, is so pertinent, so reasonable, so fair, so just, and so moderate and judicial in tone, that we cannot refrain from quoting it at considerable length. It is, withal, by Chief Justice Gibson, of whom it has been remarked (and the remark was quoted with approval by the learned attorney for the petitioner) that a greater judge never lived. Dows was arrested in Michigan, without warrant, though a warrant for his arrest was in the hands of other parties. The following is from the opinion : “Had the prisoner’s release been demanded by the executive of Michigan, we would have been bound to set him at large., As regards all but federal stipulations, the states of the Union are independent sovereignties, andi the only right which one of them has to claim.the arrest of a fugitive from its justice in the territory of another is conventional. It is created by treaty stipulation in the federal constitution, and it can be exercised only in the way therein pointed out. But the governor of Michigan, so far from resenting the prisoner’s arrest, had put a war *575 rant for his extradition into the hands of the proper officer. The sovereignty of the state, therefore, was not outraged, unless it resided in the prisoner’s person. A sovereign is doubtless bound to fight the battles of its citizen, when he has his quarrel just; but it is not bound to maintain him against demands of foreign justice from which he has fled. It may or it may not interpose its shield, at discretion; but the exercise of this discretion will be directed, not by any claim he may be supposed to have on it, but by a consideration of the consequences to the general weal. The federal constitution takes away this discretion in the case of an executive demand, and makes that a matter of duty which had else been a matter of grace; but it does not prevent a state from dispensing with a demand. The constitutional provision was not devised for the benefit of the fugitive. It was intended to obviate the principle that one government may not execute the criminal laws of another. The practice has been to arrest, on hot pursuit, a fugitive wherever found; and, were not the violation of territory consequent on it tolerated by common consent, few fugitives from justice would be brought back. In its practical results the constitutional provision is nearly inoperative. The tardy publicity of laying a ground for demand' by indictment or by affidavit, of'transmitting the document to the proper executive, and of procuring a warrant of arrest from him, necessarily warns the fugitive of his danger, and leads to another flight. It was formerly the practice of the executive in this state to act in the matter by the instrumentality of the judiciary; and, though I have issued many warrants, none of them has ever been followed by an arrest. The consequence of the inefficiency of the constitutional provision has been that extraterritorial arrests have been winked at in every state; but an arrest at sufferance would be useless if its illegality could be set up by the culprit. Has he been allowed to do so? Let the question be answered by the cases quoted.”
We cannot think that the matter in question here was fairly and fully represented to the governor of Nebraska, or fairly and fully understood by him as to all the facts, when he wrote his letter of May 19, 1891. The following remarks from a South Carolina case are so directly in point that we quote at some length. Similar remarks from courts of the highest authority might be quoted at indefinite length, but we will not take the time and space. With this quotation, which has our unqualified approval, we close our citations of authorities upon this branch of the case. The language is that of Chancellor Hae-pbr in State v. Smith, 1 Bailey, 291. Discussing the Case of Smith, the chancellor says: “But the ground principally relied on for his discharge is the irregularity in the manner of his arrest. He was arrested by means of a vio- ■ lation of the laws and jurisdiction of the state of North Carolina. I have already said, in general, that when an individual charged with an offense is before a magistrate, the sole inquiry is, does there appear sufficient cause for his commitment, or binding him to his answer? No matter what irregularities have occurred in his arrest, or whether he have been arrested or no, if it appear that the laws have been criminally violated, it is the duty of the officer to take measures for vindicating them by a prosecution. It is certain that no conceivable violation of the laws of our own state in procuring a prisoner’s arrest could authorize the discharge of one who is duly charged. Though a house or a city had been fired in order to arrest him as he escaped from the flames, or any cruelty or injustice had been practiced towards him, the law would say,‘Those who have been guilty of such enormities must answer for their own acts, and the prisoner for his.’ I am still to seek for the principle or the authority which will make a difference when the arrest has been made by means of a violation of the laws of another jurisdiction. The prisoner is charged with a felonious violation of the laws of this state. It is answered that other persons have been guilty, in relation to him, of an outrageous violation of the laws of another state, and therefore he ought to be discharged. I perceive no connection between the premises and the inference. * * * But suppose the case of a foreign state. There is no offense in trying, and, if he be guilty, convicting, the subject of a foreign government who has been guilty of a violation of our own laws within our jurisdiction. * * * In the case we are considering the prisoner is found in our jurisdiction, in consequence of a lawless act of violence, exercised upon him by individuals. The true cause of offense to the foreign government is the lawless violation of its territory. But a *577 similar violation of a foreign jurisdiction might be made for other purposes, and it would not be in the power of our tribunals to afford satisfaction. An individual might be kidnapped, and brought within our territory for the purpose of extorting money from him or murdering him. It would not seem to be appropriate satisfaction to the injured government to exempt a person justly liable to punishment under our laws where we have no means of giving up to punishment those who have violated its laws. But there is no difficulty among the states of the Union. Upon demand by the state of North Carolina, those who have violated its laws will be given up to punishment.” To a similar effect are Ex parte Scott, 9 Barn. & C. 446; Krans’ Case, 1 Barn. & C. 258; Mark’s Case, 3 East, 157; In re Miles, 52 Yt. 609; Com. v. Noyes, 11 Chic. Leg. N. 9; State v. Brewster, 7Vt. 118; State v. Ross, 21 Iowa, 467; Kerr v. Illinois, 319 U. S. 436,7 Sup. Ct. Rep. 225, and 110 Ill. 627. Even Dows’ Case, supra, relied on by petitioner, notwithstanding the broad dictum in the opening of the opinion, is entirely consistent with these views, as we have shown.
Matters of interstate comity can be arranged only by the states themselves, through their executive departments. When Wyoming’s executive has occasion to call upon this court forits co-operation in responding to the reasonable demands of a sister state, founded upon the principles of interstate comity, the court, as at present constituted, will not be backward in going as far as the furthest in doing all that can be justly .required by the most liberal interpretation of those principles. But in this court it is a mere question whether the court below acted within its jurisdiction. It may be that circumstances can arise, such that considerations of the public weal and that harmony which should always characterize the intercourse between the sister states of the republic would make it advisable for the trial court to waive its jurisdiction and release an accused person, though he were the veriest land pirate that ever raided from abroad across our borders or marauded within them; but we hope that no state will ever conceive it to be necessary to the vindication of her offended dignity, on account of the criminal violation of her jurisdiction and her laws by any individual or individuals, to ask for the release of a convicted felon. Until such request comes to us through the proper channel, we have no occasion to act upon it. No person held to answer a criminal charge, either before or after conviction, has any right to invoke the principles of interstate comity to shield him from trial when charged with crime, or from punishment when convicted.
On December 11,1890, the judgment and sentence of the trial court in this cause-was rendered in the following words: “It is found that the defendant, William Kingen, is guilty of the crime of grand larceny, as charged in the indictment herein. It is therefore considered, ordered, and adjudged by the court that the-said William Kingen be imprisoned in the state penitentiary of the state of Wyoming, to-wit, the Illinois state penitentiary, located at or near the city of Joliet, in the state of Illinois, and kept at hard labor for the period of eight years.” It is-contended on behalf of the petitioner that this judgment and sentence is void, and the legislation upon which it is founded is boldly attacked as unconstitutional and void. This legislation consists in part of paragraph 4 of the act of congress of June 16,1880, of the tenor following: “That the legislative assemblies of the several territories of the United States may make such provision for the care and custody of such persons as may be convicted of crime under the laws of such territory as they shall deem proper, and for that purpose may authorize and contract for the care and custody of such convicts in any other territory or state, and provide that such person or persons may be sentenced to confinement accordingly in such other territory or state, and all existing legislative enactments of any of the territories for that purpose are hereby legalized: provided, that the expense of keeping such prisoners shall be borne by the respective-territories, and no part thereof shall be-borne by the United States.” Pursuant to appropriate legislation by the legislative assembly of the territory of Wyoming, authorized by this act of congress, if not included in the general grant of legislative power, the proper contract was made-for the care and custody of the convicts of the territory of Wyoming in the Illinois state penitentiary at Joliet. This legislation is in force in the state of Wyoming, if at all, by virtue of section 3 of article 21 of the constitution of the state of Wyoming, which is as follows: “Sec. 3. All laws nowin force in the territory of Wyoming, which are not repugnant to> *579 this constitution, shall remain in force until they expire by their own limitation, ■or be altered or repealed by the legislature.” Itis urged thatnone of this legislation can have any effect outside the territorial boundaries of Wyoming, and that, in so far as it purports to take effect outside of those limits, it is unconstitutional and void; and that no law of Wyoming •can authorize imprisonment as a punishment for crime except in Wyoming. The learned attorney for petitioner marshals great authorities in support of this position. He quotes from Blackstone, (1 BI. •Comm. *137:') “No power on earth,except the authority of parliament, can send any ¿subject of England out of theland against his will; no, not even a criminal; for exile and transportation are punishments at present unknown to the common law.” This quotation is not a fortunate one for the petitioner. The exception of the authority of parliament shows that legislative authority extends even to theinfliction • of the punishments of exile and transportation; and, in the light of English history, it may well be doubted whether the exception did not become greater than the rule. Magna Charta is also quoted: •“No freeman shall be banished, unless by the judgment of his peers or the law of theland.” This is no better for the petitioner. The law of the land includes written or statutory law, as well as the unwritten law. If such was legislative authority in England, then it would seem ■such must it be in this country, unless restrained by constitutional provision. ■ Borne state constitutions prohibit these penalties of banishment or transportation. ■Ours does not. Neither does the constitution of the United States. So the act of ■ congress of June 16,1880, authorizing the territories to contract for the care and ■custody of their prisoners outside of their territorial limits by any other territories or states is not inimical to any express provision of the federal constitution. Neither is the legislation of the territory of .Wyoming upon that subject inimical to any express provision of our state constitution. The English habeas corpus act is also quoted, to the effect that “no subject of the realm, who is an inhabitant of England, Wales, or Berwick, shall be sent prisoner into Scotland, Ireland, Jersey, ■Guernsey, Tangier, or into parts, garrison islands, or places beyond, the seas, which are, or at any time hereafter shall be, within or without the dominions of his majesty, his heirs or successors; and that every such imprisonment is hereby enacted and adjudged to be illegal.” The inference is cogent that without this act such imprisonment was not illegal, and that it was a matter the regulation of which was rightly within the legislative authority of the government. Bo far the authorities cited to show that it is not a valid exercise of legislative power to provide punishment outside of the jurisdiction as a punishment for crime show rather the contrary. One other authority is cited, deserving of more attention, as it is a decision of the supreme court of the territory of Wyoming, the predecessor of this court. It is the case of Territory v. Nelson, 2 Wyo. 346. Nelson had been convicted of a felony, and sentenced to imprisonment in the state penitentiary of Nebraska, at Lincoln, under territorial legislation making that a territorial penitentiary of Wyoming. The penitentiary at Laramie had been built, and there was an act of congress providing that when there was a penitentiary in an organized territory, erected by the United States, territorial convicts might be imprisoned therein, etc. The word “may” was used in this connection and was construed to mean “shall.” The chief justice, in a labored opinion in the case, in connection with other suggestive questions, very emphatically puts the pregnant interrogatory: “Can any one rationally conclude that the government of the United States, through congress, had any other purpose in building a penitentiary out here in Wyoming than that it should be used for both United States and territorial convicts? ” He held that it was the intention of congress that the penitentiary at Laramie, within the territory, should be the only territorial penitentiary, and decided the case accordingly, (an associate justice delivering a concurring oxjinion,) with the savingclause, “unless congress shall otherwise legislate.” This case was decided at the March term, 1880. Congress did very promptly “otherwise legislate” by the act of June 16, 1880, already quoted. So the case of Territory v. Nelson as authority became a dead letter. This act last mentioned not only was a prompt repudiation of the decision as to the intent of congress in erecting a prison “out here in Wyoming, ” but was a settlement of the q uestion for the future of the territory. But the case seems to be cited, not so much for the decision itself as to bring in some dicta, *581 from the concurring opinion of the associate justice, to sustain the contention that the act of congress itself is unconstitutional and void, and that the subsequent territorial legislation founded on it, under which the Illinois state penitentiary was made a territorial prison, is also void.
Without taking time and space to quote these dieta at length, let it suffice to say that they are founded upon two quotations given from high authorities, and reiterate the doctrines of those quotations in various forms, and assume to fit and apply them to the case then under discussion, — the case of Territory v. Nelson. The first of these quotations is from U. S. v. Booth, 21 How. 524. It reads: “No judicial process, whatever form it may assume, can have any lawful authority outside of the limits of the jurisdiction of the court or judge by whom it'is issued; and any attempt to enforce it beyond these boundaries is nothing less than lawless violence. ” If judicial process, in the sense here used, included a mittimus, committing a convict to prison, after conviction, to serve a sentence, the doctrine announced would have overturned England’sfavorite policy of establishing penal colonies. The convict sentenced to those colonies was uniformly sent beyond the jurisdiction of the court that sentenced him to serve his term of imprisonment. The learned associate justice, after making this quotation, at once proceeds totheconsideration and attempted explanation of the case of Ex parte Karstendick, 93 U. S. 396, a case utterly inconsistent with the quotation from ü. S. v. Booth, if tha t included such a mittimus within its scope. Kar-stendick was convicted of a crime in the United States district court for the district of Louisiana, and sentenced to imprisonment in the state penitentiary at Moundsville, W. Ya. The sentence was sustained by the supreme court of the United States, and he served out his term there. But this point is too plain for argument. But a small proportion of the state courts which sentence convicts to imprisonment in the respective state penitentiaries have a state penitentiary located within their respective jurisdictions. There may not be a penitentiary within their district, and is not in the greater number of districts. The remark quoted is good law, but is sadly misapplied. The other quotation is from Cooley, Const. Lim. p. 129: “The legislative authority of every state must spend itself within the state.” This is a terse and comprehensive statement of the territorial extent to which state laws, proprio vigore, take effect. It is immediately followed, in the connection from which it is taken, by a statement of a» number of instances in which state laws are enforced beyond the limits of the state, on principles of comity. No state expressly limits the effect of its laws to its-own boundaries. The wider the extent to which their force is extended by the operation of the principles of interstate comity, the more gratifying it is to the state, and the more harmonious and satisfactory becomes the intercourse of the-states with each other. JudgeCooley says on the page already cited: “Upon the principle of comity, however, which is a. part of the law of nations, recognized as such by every civilized people, effect is given in one state or country to the laws of another in a great variety of ways.”' To such an exteiit are the doctrines and practice of comity carried even between the United States and foreign states that we have a code of laws, both civil and criminal, enacted by congress, and enforced in foreign countries over citizens of the United States by our consular courts. See Rev. St. U. S. §§ 4079-4129. This civil jurisdiction extends to unlimited amounts. Id. § 4093. The criminal jurisdiction is to try persons charged with crime according to the laws of the United States, and to-punish by imprisonment in the foreign country, (Id. § 4101;) or to inflict the death penalty there, (§§ 4102, 4103.) And this jurisdiction extends not only to countries, with which we have treaty relations, but also largely to .countries not inhabited by any civilized people, or recognized by any treaty with the United States. Id. §■ 4088. True it is, as claimed, that the sentence of transportation under British law was executed by transportation in British-ships .to another portion of British dominions, and the sentence always included a-term of years to be served there. That it was a necessary result that this term should be served out at any particular-place is not true. Generally no particular place was specified in the sentence of transportation, except at a certain colony. Neither w¿s it a necessary result of the sentence that the specified time-was served out anywhere within the British dominions. The ticket-of-leave man went practically where he chose. Many of them became practically mere exiles. Simple banishment was a punishment al *583 ways recognized as within legislative authority to inflict. This punishment often involved financial ruin, and the destruction of the dearest hopes, aspirations, and prospects in life. And, whether for life or a term of years, the punishment was endured beyond the territory subject to the process of English courts, or subject to English law, and often in unfriendly and hostile lands, beyond the vaunted protection of the English law. The punishment of the law pursued the exile where its protection could not reach him. It has been the policy of the United States, in cases where convictions have been had in United States courts, in states where no suitable state penitentiary was found for the imprisonment of convicts, to contract with other states for their imprisonment elsewhere. This policy has been adopted by new territories, with reference to the care and custody of both convicts and insane x>ersons, with beneficial results. Among the considerations bearing upon the question as to what is a suitable penitentiary is always that of its sanitary condition, and other matters having reference to the health and well-being of the prisoners, as well as their security.
It is urged that by sending con victs to another state for imprisonment they are placed beyond the reach of the protection of the law of the state, which it is the duty of the state to furnish them ; and especially beyond the reach of the pardoning power. This is not true as a matter of fact, nor as a proposition of law. By virtue of treaties and international comity, the federal government secures the enforcement of its laws for the punishment of its criminals in foreign countries. By the same treaties and the same comity it secures theenforcementof its laws for thepro-tection of the criminals in their rights. Butthismayall besuspendedby war. The statescannot make treaties, but they can make contracts, and by virtue of these contracts and the operation of interstate comity they secure the punishment by imprisonment of their convicts in sister states. By the same contracts and the same comity they secure the protection of the convicts in their legal rights. No pardon fails to accomplish its purpose. No legal action for the benefit of the prisoner of any of the proper authorities of the state so sending her convicts to the sister state fails to accomplish its purpose. The suggestion that the protection of the prisoner is imperiled by his being imprisoned in a state diSerent A*om that of his conviction and sentence is unfounded in fact. It is uncalled for, ungracious, and unjust to both contracting states. And the operation of these contracts and these principles of comity are in no danger from the occurrence of war. The states cannot declare war. We have considered the subjects of transportation and banishment to show the plenary power of legislative authority to enact laws inflicting those penalties. The statute in question in this case does not go to the extent of in dieting either of those punishments in the ordinary sense of the words. The penalty imposed by the judgment and sentence in this case does not include banishment in any sense of the term. If it includes transportation in any proper sense, it is in a very modified sense, it is not transportation beyond seas, or to a foreign shore, or to an unknown clime. It is not to a dependent province or colony. It is merely removal to a place of imprisonment in a sister state in the Union, where the individual is under the full protection of the constitution and laws of the United States, and of the state of Wyoming. It is such a transportation as is in accordance with the most recent and most advanced views of public policy, and with the practice and custom of the states and territories in providing for the proper care and custody of their criminals and insane. It is for the benefit of the criminal and the unfortunate, as well as the state, that this beneficent policy and practice and custom should be sustained; and when objection is made on behalf of a convict it is uniformly found to be, as in this case, not for the purpose of avoiding incarceration in an inferior, uncomfortable, or unwholesome prison, and for securing for the term of his sentence a better prison, or one where the confinement would be less irksome, but for the purpose of securing immunity from punishment for crime whereof he has been duly convicted.
It further appears from the evidence on file that on the 3d day of September, 1891, —that being a regular day of the May, A. D. 1891, term of the court, that tried the petitioner on the charge of grand larceny, —the following order was made and duly entered of record in said court: “Now, on this day comes into open court the said William Kingen, in person and by his attorney, Henry St. Raynor, and also comes the county and prosecuting attorney of said Laramie county; and the Said county *585 and prosecuting attorney now in open •court, and in the presence of the said William Kingen, moves the court that the sentence heretofore, at the November, A. D. 1890, term of this court, pronounced against said defendant, William Kingen, be carried into execution. And, it appearing to the court that no writ of error or other proceeding in error, as provided by law, has been allowed in this case, it is now ordered by the court that the sentence heretofore, on the 11th day of December, A. D. 1890, pronounced against said defendant, William Kingen, be carried into execution. And, it further appearing to the court that since said sentence was pronounced, the state board of charities anci reform has changed the location of the penitentiary of the state of Wyoming from Joliet, in the state of Illinois, to Laramie City, in the state of Wyoming, and has in writing notified the judge of this court of such change, it is now ordered by the court that the mittimus in this case be directed to the warden of the penitentiary of the state of Wyoming, located at Laramie City, in the state of Wyoming. ” It is assumed that this order is, in effect, a change or modification of the judgment and sentence pronounced at the preceding Novemberterm of the court. Numerous authorities are cited to the effect that a court has not the power to change or modify its judgment after the expiration of the term at which such judgment was rendered and recorded. This rule seems to be well settled. But the argument for the petitioner is vicious, in assuming that tills is a change or modification of the judgment. The judgment stands of record in the precise form as before. No authority has been cited to the effect that after sentence of a convict to imprisonment in the penitentiary the location of the penitentiary may not be changed by proper authority, and the imprisonment be accomplished at the new location. On the contrary, the making of such changes is a common custom, and is generally sustained. It is a power that cannot be denied without working in many cases great inconvenience to the state, and great hardship to the prisoners themselves. Sanitary conditions, overcrowding, destruction of a prison by fire or flood, many considerations of necessity and convenience, make it necessary that the discretion of making such removals be vested somewhere. The legislature of Wyoming has seen fit to vest this discretion in the state board of charities and reform. That board has at least colorable authority of law for the exercise of such discretion. Whether that authority be valid for the purpose to which it has been applied in this instance, or whether that discretion be properly exercised, we cannot try on habeas corpus. The district court has no power to fix the location of the penitentiary of the state, or to compel that it remain in a place where fixed for a year, or a month, or a week, or a day. The authority of that court on a conviction for grand larceny is to pronounce judgment and sentence that the convict “shall be imprisoned in the penitentiary not more than ten years.” Laws 1890, c. 73, § 39. The statement of the location of the penitentiary is no necessary part of the sentence, and adds nothing to the effect of the sentence. It is probably correct practice to insert it, but such insertion binds no one, and is ofno effect other than to indicate where the penitentiary is located at the date of the sentence.
The late case of O’Brien v. Barr, 49 N. W. Bep. 68, is directly in point. It was decided by the supreme court of Iowa, May 28,1891. Plaintiff was sentenced by the district court of Wapello county, at its January term, 1884, to imprisonment in the penitentiary at Ft. Madison, at hard labor, for a term of eight years. Afterwards, by virtue of an order of the executive council, which had charge of such matters, he was transferred to the penitentiary at Anamosa. He was not selected by this council by name, but was selected, with others to the number of 20, by the warden, under the order of the executive council. He brought his action by petition in habeas corpus, claiming that the “orders of the executive council are without authority of law, and void, and do not mention or bind the petitioner, and that plaintiff can only be confined in the penitentiary of the state as sentenced, and that the sentence cannot be modified or contradicted by order of the executive council.” The court says: “Theimprisonmentand its duration could alone be determined by the court. But fixing the particular penitentiary in which the petitioner should be confined is not a part of the judgment. The effect and duration of confinement is all that was judicially determined by the judgment. The conviction was for burglary, and the punishment provided by the statute is, ‘ He shall be punished by imprisonment *587 in the penitentiary,’ and not in any particular penitentiary.” This case has the support oí both reason and authority. Ex parte Waterman, 33 Fed. Rep. 29, decided in the United States district court for the northern district of New York, is a case in point. It was a petition for ha-beas corpus, the petitioner being a woman, who had been convicted under section 5457, Rev. St. U. S., by which the penalty prescribed was a fine of not more than $5,000, and imprisonment at hard labor not more than 10 years. Petitioner, on October 11, 1886, was sentenced to imprisonment at hard labor in the state-prison at Auburn for the term of three years. On October 16th following the marshal took her to Auburn, but the warden of the prison there would not receive her, because the state law did not allow him to receive females. On the same day the court, during the same session, but in the absence of the petitioner, made an order substituting the Erie county penitentiary as the place of imprisonment. The court says, arguendo: “It cannot be denied that the authorities are unanimous in holding that, where the slightest corporal punishment is inflicted, the defendant must be present in court when the sentence is pronounced. Safford v. People, 1 Parker, Grim. R. 474; Dougherty v. Com., 69 Pa. St. 286 ¡State v. Hurl but, 1 Root, 90; Son v. People, 12 Wend. 345; People v. Winchell, 7 Cow. 525; Rex v. Harris, 1 Ed. Raym. 267; Whart. Grim. PI. (8th Ed.) §§ 550,912; 1 Chit. Crim.Law, 695. This rule must, it would seem, apply with equal force to all subsequent modifications of the sentence proper, though apparently formal and unimportant. Themoment the right to change the sentence at all, in the absence of the defendant, is conceded, the door is open to the admission of the most radical and sweeping amendments, in direct violation of the humane principle upon which the rule in question rests. If, therefore, the court were now satisfied that this clearly recognized provision of the law had been violated, the case would be a plain one; but it is contended that the designation of the place of imprisonment is /lio part of the judgment.” This view was approved, and the court remanded the prisoner, on the ground that the order fixing the place of imprisonment was not necessarily a part of the judgment.
It is further urged on behalf of petitioner that the state penitentiary cannot be located at Laramie City; that it is located at" Rawlins for 10 years by the constitution. Without stating the various constitutional and statutory provisions necessary to an understanding of this question, it is sufficient to say that it is-apparent from this record that there is a state penitentiary in operation, at Laramie, prepared to receive convicts. Whether it is a state penitentiary de jure, and whether there is any other state penitentiary of Wyoming in operation, and prepared to receive convicts, we cannot, in this proceeding, properly inquire. From the foregoing considerations we find (1) that the court below acted within its jurisdiction; (2) that its judgment and sentence is valid; (3) that such judgment and sentence has not been changed or modified, and that the change of the location of the state penitentiary, and consequently of the place of imprisonment of petitioner, is not a change ormodification of his sentence; (4) that the restrain t of his liberty by the defendant and respondent is legal. The petitioner is therefore remanded to the custody of the defendant and respondent, the sheriff of Laramie county.
Gkoesbegk, C. J., and Merrell, J., concur.

 26 Tex. App. 121.