# MARCH 11, 1942

## EMELIANO BENAVIDEZ V. THE STATE.

No. 21542. Delivered May 21, 1941.
Rehearing Denied October 8, 1941.
Appealed to United States Supreme Court.
Stay of Execution Granted October 10, 1941.
Order of United States Supreme Court Denying Petition for Certiorari
Filed March 6, 1942.
Order Staying Issuance of Mandate Set Aside and Clerk Directed to
Issue Mandate March 6, 1942.

The opinion states the case.

*M. C. Gonzales,* of San Antonio, amicus curiae.

*Wm. E. Davenport,* of San Angelo, for appellant.

*O. C. Fisher,* District Attorney, of San Angelo, and *Harris Toler,* of Austin, and *Spurgeon E. Bell,* State's Attorney, of Austin, for the State.

GRAVES, Judge.

Appellant was assessed the death penalty for the alleged murder of Henry Calcote, and he appeals.

From the evidence it is gathered that appellant had been working for the deceased on a ranch in Schleicher County. That on a day or two prior to the homicide the deceased had transferred appellant to the ranch home of Jeff Enochs, about six miles from deceased's home where appellant had previously been employed as a day laborer. Mr. Enochs was in process of moving his family into the town of Eldorado, and appellant was left out on the ranch to look after the stock and attend to the chores around the house. Mr. Enochs had two rifles, one an old model and one a comparatively new 30-30 rifle, which latter gun was left in a scabbard, and which the appellant had used and was familiar with, and knew where such gun was kept. On Thursday before Saturday, on the fifth of September, 1940, the deceased had brought appellant back to Mr. Enochs' and appellant started to work for Enochs. The appellant then went to the Enochs' place and was not seen by Mr. Enochs for a few days; however Mrs. Enochs and her daughter did see him at their ranch home on Thursday afternoon. On the next morning Mr. Enochs saw the deceased's pickup truck abandoned upon the highway between the ranch home and Eldorado. On the following Saturday the body of Henry Calcote was found in the Calcote home with a bullet wound in the back of the head; there was also found the body of Mrs. Calcote, the mother of Henry Calcote, and she also had a bullet wound in the back or side of her head. There were also evidences that one shot had been fired into the house from the outside through a screened window, and one 30-30 rifle exploded shell was found some five or six feet outside the house near the screened window with a hole in it. These two deceased persons were fully dressed, and the beds of the house, except a baby

bed, showed not to have been slept in. A pistol known to have been owned by the deceased was not found on the premises. The pickup truck of the deceased, found out on the highway, had the steering mechanism badly bent, and the front axle was also bent out of line. Earl Cathey, a neighbor of the Calcotes, visited them about 6 o'clock Thursday afternoon, September 5, 1940, and talked with the family; on Friday following he again had occasion to go to the Calcote home; he found the gates open, which should have been closed, and waited for some one to come out of the house for a few minutes, but no one came and he finally drove off. On Saturday he was again at this place, looking out for stock straying through these open gates into the pasture of Cathey. He then noticed the tracks of an automobile leading through one of these open gates into witnesses' pasture, and he followed these unusual tracks through a dim road to a point near a windmill and on out of witness' pasture through another opened gate. There were peculiar tire marks here on the ground where the tracks had suddenly stopped and then backed up and had finally gone out of the pasture. Later on that afternoon near this last spot witness, in company with others, found the dead body of Mrs. Dardinella Calcote and her baby, both being shot through the head, they being clothed in the same garments that they had on when Cathey had last seen them on the Thursday preceding this Saturday, such bodies evidencing advanced decomposition. At this point there were two discharged 30-30 rifle shells found. Mother and child were lying near each other with bullet holes in their heads, and a baby's milk bottle near them.

Sheriff O. E. Conner testified that he saw appellant at Sanderson, Texas, on September 20, 1940, and carried him to the jail in Mertzon, Irion County, and there appellant made to him a voluntary confession as follows:

"The State of Texas, County of Irion.

"I Emiliano Benevidez, being in custody of John Boyd, Sheriff of Irion County, Texas, having been first warned by O. E. Conner, the person to whom the hereinafter set out statement is by me made, that I do not have to make any statement at all, and any statement made by me may be used in evidence against me on my trial for the offense concerning which this statement is made, do here make the following voluntary statement in writing to the said O. E. Conner:

" 'My name is Emiliano Benevidez, and I was born in Old

Mexico, and I think I am maybe 35 years old. Two weeks ago day before yesterday, Mr. Henry Calcote took me from his place after dinner to Mr. Jeff Enochs' place. Before we got to Mr. Enochs' place we met Mr. Enochs and a white boy in Mr. Enochs' pick-up. I got out and got in Mr. Enochs' pick-up and put my bedding in there and took my suit case. Mr. Henry Calcote then went back toward his place and I went with Mr. Enochs and the white boy to Eldorado. I asked Mr. Enochs for $2.00 to get my laundry with, and he let me have it, and the white boy he took me to Gregario's place in Eldorado and I gave her one dollar for doing my laundry. I went with the white boy and we went back to Mr. Enochs' place. When we got there I took my bed roll in and put it on the porch and told the white boy I felt sick and that I can't work that day. I told him I was sick so he would go away and would not be there, but I was not sick; I felt all right. So then while I was there I milked the cows and I fed the hogs and I washed up the dishes, and then I saw Mr. Ed Finnegan down there and he was getting the rake, and I went to where he was and I talked to him, and I opened the gate so the cows could go through. Then Mr. Ed left and I went back to the house, and pretty soon Mrs. Enochs and her girl came out there and got some things in the house, and I helped them load them things and they leave. After they leave, in about 25 minutes I leave Mr. Enochs.' Before I leave I got his 30-30 gun out of the scabbard and then I put the old gun in the scabbard. Maybe about one week before that when I was working for Mr. Enochs, I took his 30-30 gun to my place where I sleep one night, and I looked in the gun then and I saw there were 9 shells in it. So, I took the 30-30 on Thursday after Mrs. Enochs left and I walked to where Mr. Henry Calcote lived. I walked along by the railroad down there. When I got to where Mr. Henry lived, I went around and climbed over the rock fence and went up close to the kitchen window and I saw Mr. Henry Calcote come to the kitchen and when I saw him there I saw him get some water to drink. Then I looked through the window and I shot him through the screen wire and I shot him in the back of the head.

"After I shot Mr. Henry Calcote, after I took good aim at him through the window, I run around the house quick and go into the front part of the house and I run through the house and then I saw Mrs. Calcote and Mrs. Dardinella go into the kitchen, and I run to the kitchen door and I take aim at Mrs. Calcote and shoot her in the head one time. Then I tell Mrs. Dardinella I want to talk with her and for her to go with me.

Before I got out of the house I got a pistol from the dresser; I knew where they kept the pistol because I saw Mr. Henry put it there before.

"When I got the pistol out of the drawer in Mr. Henry and Mrs. Dardinella's bed room, I then go outside. Mrs. Dardinella, who is Mr. Henry Calcote's wife, she then took the baby out of the bed, and then I went to the garage and I tried to open the door where the roadster car was and I could not get the door loose so it would open, so I took the pick-up car out of there and then I leave with me the 30-30 gun and the pistol. And I drove off with Mrs. Dardinella and the baby. And when we got over close to the gate that goes to Mr. Earl Cathey's, Mrs. Dardinella she say for me to go on by Mr. Cathey's place, but I told her no, I want to go to the windmill. So I turn and go to the gate that goes to Mr. Calcote's west well, and when I get to the well I stopped and I get a drink of water, and then I went back the same way, and when I come to Mr. Cathey's road I turned there and went toward Mr. Cathey's and through the gate. I left the gate open to the west well, and I left the gate open that goes to Mr. Cathey's. After I got through Mr. Cathey's gate, pretty soon I turn off that road and go around the field and I turn just before I got to the windmill of Mr. Cathey there, and I then drove down by the little field and across the pasture. I already knew where the old road was because I have worked for Mr. Earl Cathey and I ride in that pasture. When I got over the hill and to the wire gate I got close and make the brakes slide the wheels some, and then I back up in the pick-up and then I drove up the fence some piece and stopped the car. Then we get out of the car and she walked ahead of me a little piece and after we got a little way, she turn her head around and I shot her with the 30-30 gun.

"Then after I shot Dardinella Calcote with the gun, the baby fall down there on the ground and then I shoot the baby with the gun; I shot the baby in the head. Then I went and got in the pick-up and drove back to the gate where I had already slip the wheels and I opened the gate and drove on through and did not close the gate. Then I drove pretty fast and pretty soon I hit a rock or something, and then the car drove pretty slow and I went through another gate, and I left that gate open too, and I drove on to the highway, and after I drove to the highway I turned the car toward Eldorado. The car is then pretty hard to drive, because it did not want to go straight and then I drove on toward Eldorado, and when I got down

close to where Mr. Finnegan lived I stopped the car on the side of the road. The car was going too slow and I stopped it, and then I got out and took the 30-30 that shot Mr. Henry Calcote and his mother and Mrs. Dardinella and the baby with, and I also took with me the pistol and I climbed over the fence and went into Mr. Ed Finnegan's pasture and walked on to Mr.. Jones' pasture, and I walked on until I came to Feliz Atispi's, and there I left the 30-30 gun, and then I walked on close to the railroad track all the way to Sonora. I got to Sonora about night the next day after I shoot the people. When I got there I went to Faustina Butista's house and there I told him I want to get something to eat. While I was in Sonora I got some bread and some sardines. I gave the money to a Mexican boy and he then went and got it for me.

"I then walked all the way to the Rio Grande river, and a little above Del Rio, maybe about five miles up the river. There I waded across the river into Old Mexico. A few days later I waded back across the Rio Grande river close to Sanderson. After I waded across, pretty soon a man take me to Sanderson and put me in jail. I killed the people because I think Mrs. Dardinella Calcote like me.

"Mr. Conner has read this statement over to me and it is true, and I tell about this because I want to tell the truth of what happened.

"This the 21st day of September, 1940.

"(Signed) Emiliano Benevidez.

"Witnesses: O. E. Conner
      "C. W. Taylor."

It is also worthy of note that Julian Faba, who lived near one Feliz Arispi, testified that about midnight of September 5, 1940, Thursday, appellant came to his, Faba's, house and awoke him, appellant having a gun in his hand, and said that he, appellant, wanted to see Feliz Arispi; that he had killed a man, and wanted Faba to take him to Arispi's, which Faba refused to do, but did call Arispi, who came over to Faba's house, and appellant gave the gun to Arispi. Arispi testified that he then took the gun and buried it in the ground, and later turned the gun over to Sheriff Conner, and same was in evidence in this case.

Ballistic experts took the three exploded shells found near

these homicides and testified that these shells were fired from this 30-30 rifle delivered to the sheriff by Arispi, and which was identified by Mr. Enochs as his rifle.

This case took a rather peculiar turn after the last juror was selected, and the appellant, having been thereto arraigned, and having pleaded not guilty, was again called upon to plead after the indictment had been read to the jury, and the following proceedings were had as shown by the record in bill of exceptions No. 1:

"The Court: Emiliano Benavidez, what is your plea? A. I plead guilty; I killed him.

"Q. How is that? You do plead guilty? A. Yes.

"Q. Emiliano Benavidez, I am asking you whether your plea is guilty, or not guilty, at this time? A. I am pleading guilty.

"Q. You understand that I am asking for your plea of guilty or not guilty, at this time? A. Yes.

"Q. Then your plea will be received.

"By Mr. Davenport, for the Defendant: If the Court please, we would like to talk to him a little.

"The Court: Emiliano, you can understand what I say, can you? A. Yes, I understand all right.

"Q. You understand all right. You understand that the Court is just at this time asking you whether you plead guilty or not to the charge contained in this indictment? Or, whether you plead not guilty? You have your choice of pleading guilty to the murder of Henry Calcote or you have your choice of pleading not guilty? Do you change your plea of not guilty to a plea of guilty? A. I can't understand that very well.

"The Court: Is Joe Flores, the Interpreter here? Come around Joe Flores, and be sworn. (Joe Flores, sworn as official interpreter of Spanish into English, and English into Spanish).

"The Court: Mr. Fisher, again read the indictment and let the Interpreter repeat it to him in Spanish. Read it slowly and let him repeat that he may fully understand. (Indictment read a few words at a time and interpreted to the defendant by the Interpreter, Joe Flores.)

"The Court: Q. Emiliano Benavidez, you have heard the reading of the indictment? A. Yes.

"Q. * * * charging you with the murder of Henry Calcote? A. Yes sir.

"Q. How do you plead? Guilty, or not guilty. A. Will you permit me to talk to my lawyer a few words and then I will enter a plea of guilty.

"Q. All right, you may have the privilege of talking to your counsel?

"Mr. Fisher, go down and excuse the other members of the Special Venire — we are going to take a recess.

"By Mr. Franklin, for Defendant: If the Court please, I ask to be allowed to withdraw from this case as. I entered it on a misunderstanding.

"The Court: Well, Mr. Franklin, we are a long way along now and the Court will have to think about that.

"By Mr. Franklin, for the defendant: Then I will go ahead under the Court's instruction.

"The Court: At this time I wouldn't feel like relieving you as counsel. The Jury will retire back to the jury room; we are fixing to take a little recess at this time.

(Jury Retired)

Defendant Emiliano Benavidez retired into side room with officers and W. E. Davenport and O. O. Franklin, attorneys for Defendant.

"The Court: Bring the Jury in.

(Jury Returned to Box)

Bring the Defendant around. (Defendant and Joe Flores to front of stand.)

"The Court: (Interpreted to Defendant by Flores).

"Q. Emiliano, I again ask you how you plead to this indictment read to you a few minutes ago? A. I am guilty.

"Q. Emiliano Benavidez, upon a plea of guilty to the charge contained in the indictment the jury will, upon instruction from the Court, find you guilty and assess your punishment at death or life imprisonment in the penitentiary; or, for any term of years confinement in the penitentiary, not less than two. Now, understanding the punishment for the offense charged in the indictment do you still insist on pleading guilty? A. Yes, I enter a plea of guilty.

"Q. Then I take it that your plea is a voluntary one; that is to say, that you have made up your own mind to enter this plea? A. I am pleading guilty because I have no chance whatever.

"Q. Then it is your desire to now enter a plea of guilty? A. I have one chance that could help me, but I am a man — a Mexican, and I am taking the responsibility upon myself.

"Q. Has anyone talked you into doing that, or have you made up your own mind to do that? A. No one has advised me of any such, and to this charge I am entering a plea of guilty because I am a guilty man.

"Q. Then I take it you do not expect to receive a pardon for the offense charged? A. All right.

"Q. You do not expect it? A. No, sir.

"All right, gentlemen, it appearing to the Court that as far as the record discloses the defendant is of sound mind, and I will accept his plea of guilty."

Immediately after such proceedings, appellant moved the court to grant to him a continuance or postponement of the case, not only on account of the absence of witnesses set forth in an original and supplemental motion for a continuance, but also on account of the appellant himself changing his plea before the jury from not guilty to a plea of guilty. It is also shown herein that all of the witnesses set forth as desired in appellant's motion for a continuance were in attendance upon the trial, and it was also shown in such first motion for a continuance that appellant had told his attorney on September 24, 1940, in an interview, that he was guilty but did not want to be electrocuted; and although appellant afterwards is alleged to have told his attorneys a rather fanciful story of being kidnapped by one of the kinsman of the deceased and another masked man and made to walk six miles and witness the killing of these four persons. The appellant's attorney, according to his own sworn motion for a continuance, knew that appellant had confessed to him, and might confess to the jury his guilt in this wholesale homicide.

Nowhere in such bill No. 1 does he plead surprise, and in no way can we see how a continuance or postponement could have benefited him. We overrule this exception.

Bill No. 2 relates to the trial court's action in failing to

sustain appellant's challenge for causes to certain jurors, some of whom testified that from street talk and gossip they had formed an opinion as to appellant's guilt. Each one of whom, however, testified that they had not talked to any witness and knew naught of the facts save rumor and gossip, and that they could set aside this opinion, which was not a fixed one, and could try this case upon the evidence presented to them and the court's charge. We think such a condition of mind of the juror fulfilled the requirements of Art. 616, par. 13, C. C. P., and the overruling of the challenge for cause was not an abuse of judicial discretion. We also fail to see any error evidenced herein on account of the fact that appellant afterwards entered a plea of guilty as shown in bill of exceptions No. 1.

Bill of exceptions No. 3 relates to the overruling of appellant's motion for a new trial, and brings forward certain testimony heard therein, wherein appellant for the first time complains of a mistreatment by certain officers in Mexico wherefrom he claims to have been brought into Texas, and also claims that certain officers in Texas, none of whose names he mentions, also mistreated him and subjected him to pain and torture in order to make him confess to this offense, which he denied having committed at the hearing on the motion for a new trial.

We are at a loss to know upon what grounds this testimony was offered. Surely not as newly discovered evidence, since, if appellant ever knew such alleged facts, he knew them at the time of the trial of the case, and had known them for about twenty days; he knew them, if at all, eleven days before the trial of this motion when he had pleaded guilty as shown above. It was shown appellant had the benefit of two retained attorneys, and had conversed with them, and at one time admitted his guilt; at another time denied his guilt; then upon arraignment denied his guilt, and upon final plea again admitted his guilt. He finally came eleven days after the conclusion of his trial and requested a new trial in order that he might have another chance and entered a denial thereof and a repudiation of his statement on the ground of newly discovered evidence. Such seems to us to be but trifling with the courts, and would not meet up to the requirements of Art. 753, para. 6, C. C. P., which says:

"New trials, in cases of felony, shall be granted for the following causes, and for no other; * * *

"6. Where new testimony material to the defendant has been discovered since the trial. A motion for a new trial on this ground shall be governed by the rules which regulate civil suits."

There was no objection made to the introduction of this alleged confession at the time it was offered, and no further bills of exception than those heretofore noticed appear in the record.

The confession itself was admissible; so we think, among other reasons, because therein appellant made a statement of a fact found to be true, that is the finding of the instrument with which the offense was committed. The gun from which the shells were fired that were found near the dead bodies of the Calcote family, was found in the possession of Arispi by means of this statement of appellant. See Art. 727, C. C. P.

We think the jury was in possession of sufficient testimony to relieve the matter of any reasonable doubt but that appellant was guilty of this monstrous crime. They had his written and signed confession, his statement to Julian Faba, and his confession in open court,—enough, so we think, to convince the most skeptical, and we think under the facts they were justified in their verdict.

We find in the papers of this case a brief filed by M. C. Gonzales, as amicus curiae, or friend of the court, who raises one interesting question, and that relates to international comity between this Nation and the Republic of Mexico. The proposition laid down therein, if based upon any probable proof, might present some complications relative to a violation of treaty rights between the two countries. Unfortunately for appellant, the proffered testimony which attempts to show his abduction from our sister republic is vague and indefinite in that it is not clearly shown by whom this claimed abduction was made. We of course recognize the full right of sovereignty of Mexico over the lands that lie south of the Rio Grande river boundary, and fully agree with the friend of the court that not only is that sovereignty supreme in that territory, but also that neither this State nor Nation has any right to exercise any sovereignty nor powers below the boundary. See Dominguez, v. State, 234 S. W. 79.

Unfortunately for the position taken herein by the friend of the court, the appellant leaves the inference that he was

arrested on the Santa Rosa ranch in Mexico by two soldiers, and they put him on Texas soil and he was there received by American officers. We have heretofore held in Ex parte Wilson, 140 S. W. 98, as follows:

"We are inclined to think that the evidence sustains the officers' contention that relator was across the boundary when he was arrested, even though he may have been brought there by force as he contends; and, there being no evidence that Texas officers were in any way connected with the citizens of Mexico whom relator charges with wrongdoing, we cannot impute such wrongdoing to them. Suspicious circumstances cannot outweigh the positive evidence of Officers Stansel and Smith. From the evidence it is clear that relator was brought to the United States by force, but officers of this state or country are shown to have had no connection with such a conduct. Would the fact that citizens of a foreign country had brought relator across the boundary line, and, when he had thus been brought, our officers had their attention called to the fact that he was in this country, be grounds for his release under habeas corpus? If it had been shown that the officers of this country were parties to the illegal conduct of the citizens of Mexico, a different question might be presented."

Nowhere does appellant say that he was arrested by American soldiers, but the use of the statement that he was received in Texas by American officers would at least be persuasive that the arresting soldiers were not Americans, but rather Mexicans who were rightfully present on their own soil, and who delivered appellant on Texas soil to American officers.

Again we held in Ex parte Ponzi, 290 S. W. 173:

"The relator's situation before the courts of this state is that of one who was abducted or kidnapped in another state and brought into this one. The fact that one was kidnapped in another state by an individual not acting under the governmental authority is not regarded in this state as a reason for releasing a fugitive from justice in a habeas corpus proceeding. See Brookin v. State, 26 Tex. App. 121, 9 S. W. 735; Ex parte Wilson, 63 Texas Cr. Rep., 281, 140 S. W. 98, 36 L. R. A. (N. S.) 243; Ex parte Bergman, 60 Tex. Cr. R. 8, 130 S. W. 174; Innes v. Tobin, 240; U. S. 127, 36 S. Ct. 290, 60 L. Ed. 562; Ker v. Illinois, 119 U. S. 436, 7 S. Ct. 225, 30 L. Ed. 421; Lascelles v. Georgia, 148 U. S. 543, 13 S. Ct. 687, 37 L. Ed. 549; Mahon v. Justice, 127 U. S. 700, 8 S. Ct. 1204, 32 L. Ed. 283; Kingen v.

Kelley, 3 Wyo. 566, 28 P. 36, 15 L. R. A. 177; Baker v. State, 88 Wis. 147, 59 N. W. 570."

We are of the opinion that the record presented to us does not evidence error, and we therefore affirm the judgment.

ON MOTION FOR REHEARING.

BEAUCHAMP, Judge.

In his motion for rehearing complaint is made that this court has not fully considered appellant's bill of exception number one, and that because of the things therein complained of counsel for appellant did not have sufficient time to properly investigate the "fanciful story" given by his client to determine the truthfulness thereof. To the extent that complaint is thus made, the question raised was amply considered in the original opinion. The amount of time which he had was far greater than that guaranteed by law and all the facts and circumstances were before the trial court, whose sound discretion in the matter we must respect.

Attack is also made on the confession introduced in this case and the manner in which it was obtained. It will be sufficient to say that the record does not contain undisputed facts nor overshadowing circumstances which would warrant this court in reaching a conclusion different to that found by the trial court. We may grant the correctness of the argument that confessions are frequently of doubtful probative force; that they may not be in good conscience be considered at all times worth very much to prove the truth of the facts which they assert. There is no way to measure the force and effect of fear, nor the weight on the mind of an individual which the persuasion applied may have. Some statements "obtained" by investigating officers may appear to be preposterous, but we have no means of so branding the statement in this case as is contended by appellant. On the other hand it is a well settled proposition of law that when a confession leads to the discovery of physical facts and other undisputed evidence and circumstances which unerringly point to the guilt of the accused verity is imputed to such statement. Such is the case before us. The implements used in the commission of the crime that were discovered following the confession of appellant, as a direct result of it, and their force as evidence in this case furnish a reliable source of information which, independent of the statement itself, stand out as indisputable evidence pointing to the

guilt of appellant and to the exclusion of all others.

This appeal is from a verdict of death and it is but human to expect that any judge charged with the duty of writing or passing upon the case should give it more than ordinary consideration. Especially is this true in the case of one of foreign birth who is ignorant of the customs and procedure of our courts and whose view, of necessity, is different to that of the ordinary offender and who is not capable of giving proper aid and co-operation in the defense of himself against the charge of murder. It is also true that there will be matters in the record of a case, admittedly true as in the one before us, which also appeal to the human sympathy and which require a forecful consideration of the record of the case from the standpoint of the prosecution. The writer would be very reluctant to accept as a juror some of those taken in this case if they were called under some circumstances. But to apply appellant's view to a case of this character would exclude the possibility of a trial for the most heinous crime conceivable. No juror may be obtained who would measure up to such standards and at the same time fulfill the requirements of law and common sense for the qualifications to serve on juries. The discretion of the trial judge should be exercised with great care and conscientiously. We credit him with having done so and place full faith in his conclusion. The inflicting of the death penalty might be a circumstance of suspicion pointing to the disqualification of a juror who said he had formed some character of opinion, but, in view of the record of the crime committed by this appellant, we cannot conceive of a jury reaching any other verdict than that returned in this case. His admission of guilt surrounded by all the facts of the case make it improbable that any jury would do otherwise than find him guilty. There is no mark or brand in the final judgment of this case which would cast any suspicion that it was a result of the preconceived opinion of jurors selected to try the case. We are unwilling to read between the lines or to see that which does not appear in the record.

The motion for rehearing is overruled.

### ORDER.

HAWKINS, Presiding Judge.

Upon the request of attorneys for appellant an order entered on the 10th day of October, 1941, directed the Clerk of the

Court of Criminal Appeals to stay the issuance of the mandate for a period of ninety days from said date in order that appellant might file application for a writ of certiorari to the Supreme Court of the United States.

Appellant's application for writ of certiorari was denied on March 2, 1942, as evidenced by Order on Petition for Writ of Certiorari issued by the Clerk of the Supreme Court of the United States, and filed in the Clerk's office of this Court on March 6, 1942.

Therefore, it is directed by this Court that the order heretofore made on October 10, 1941, staying the issuance of the mandate be set aside, and the Clerk of the Court of Criminal Appeals of the State of Texas is hereby directed to issue mandate to have the judgment of this Court executed.